Paul Hammers, Plaintiff-Appellant, v. Board of Fire and Police Commissioners of City of Mattoon, Illinois, Defendant-Appellee.

Gen. No. 10,060.

Third District.

May 14, 1956.

Rehearing denied June 11, 1956.

Released for publication June 11, 1956.

Kenneth A. Green, of Mattoon, for plaintiff-appellant.

Craig & Craig, and R. G. Real, City Attorney, all of Mattoon, for defendant-appellee; J. E. Horsley, of Mattoon, of counsel.

PRESIDING JUSTICE HIBBS delivered the opinion of the court.

The plaintiff, appellant here, instituted this action in the Circuit Court of Coles county to reverse an administrative decision of the Board of Fire and Police Commissioners of the City of Mattoon entered July 21, 1954, which discharged the plaintiff as a policeman. The Circuit Court affirmed the action of the administrative board.

On or about February 1, 1952 Larkin Jones, then the Chief of Police of the City of Mattoon filed a letter with the Board of Fire and Police Commissioners of that city requesting that the Board discharge Paul Hammers, a policeman. The letter set up that on the night of January 29, 1952 the Chief arranged to put into effect on the following night a trap for a person who

had assaulted one Nedra Ellsworth. Under the plan all police officers including the appellant, Paul Hammers were to take their places in specified spots in the vicinity of the 1400 block on Lafayette avenue in that city and were not to leave the scene until the Chief picked up Officer Heckwine, who was to be used as a decoy, and personally came by each car and notified the officers that they could leave their post of duty.

On the night of January 30, 1952, pursuant to such plan, all police cars and two sheriff's cars were assigned to certain places indicated by the schedule. The plaintiff, the appellant, and officer Baker were assigned to one car spotted at the corner of 15th street and Lafayette avenue. They stayed there while officer Heckwine made three or four trips by their car and then officer Hammers said: "I guess it is all over, let's go," and proceeded to leave the designated spot to where officers Plummer and Creek were stationed in their car. It was charged that the plaintiff told Plummer and Creek that it was over, "Let's go home," and they also left, thus leaving two gaps in the line.

It was further charged in the letter that plaintiff wilfully and without authority disobeyed the orders of the Chief of Police in not remaining at the spot assigned until relieved by personal orders, and through his wilful conduct endangered the life of officer Heckwine and so disrupted the plan to apprehend the person who had been causing the assaults that he escaped.

The Chief recommended that officer Hammers be relieved of his duties as a police officer in the City of Mattoon.

The Board of Fire and Police Commissioners held a hearing on the purported charges in February 1952 without filing written charges against Hammers, as required by the provisions of Chapter 24, Sec. 14—11 of Illinois Revised Statutes, 1951. At the conclusion of that hearing the plaintiff here was discharged by the Board. Later he filed a complaint with the Circuit

Court to review the decision, which was affirmed. Thereafter Hammers appealed to this court where the cause was reversed for the reason that no written charges had been filed and the appellant nor anyone in his behalf had any knowledge of the contents of the letter or the particular charges against him. (Hammers v. Board of Fire & Police Com'rs, 1 Ill.App.2d 421.) In that case it is said: "If the letter written by Chief Larkin Jones to the chairman of the Board had been given to Hammers in reasonable time so that he would have had full knowledge of the offense charged against him and time to prepare any defense he may have had, then the provisions of the statute would have been satisfied. But this was not done. Instead, the officer was notified orally late in the evening of February 3, 1952, that he would have a hearing before the Board at 10:30 A. M. the following morning. This court does not believe that the statute has been complied with, either in letter or spirit."

Thereafter the Board of Fire and Police Commissioners ordered the plaintiff reinstated, and three days later, the Board filed the charges against the appellant. The first charge consisted of a recital of the letter of the former police chief, Larkin Jones. Then there was added six other charges. The additional charges, especially three to six, are not now of importance inasmuch as the Board's opinion and decision was based solely upon the charges contained in the letter of February 1, 1952 of the then Chief of Police, Larkin Jones. The appellant was served with a written copy of the charges against him and relieved of his position as a patrolman on the police force. The charges were set for hearing for June 4, 1954. The decision of the Fire and Police Commissioners Board was filed on the 21st day of July 1954 and found that the charges contained in the letter of Larkin Jones, former Chief of Police, had been sustained by the evidence. The Board found that on the 30th day of January 1952 the appellant wil-

fully and without authority disobeyed the orders of his superior officer in failing to remain at the post of duty assigned to him and in so doing endangered the life of officer John Heckwine and disrupted the plan of the Chief of Police to apprehend the person who had theretofore viciously assaulted a woman in the City of Mattoon, that he cursed his superior officer and was guilty of insubordination towards him. The order finally found that the appellant was not a fit and proper person to be a member of the police force of the City of Mattoon, and his discharge on the 5th day of February, 1952 was thereby made permanent.

It is contended by the appellant in this court, (1) that the Board of Fire and Police Commissioners could not legally prefer the charges and then sit as judges at the hearing thereof; (2) that due process of law applies to administrative proceedings as well as judicial proceedings; (3) that in the interpretation of the fire and police commissioners statute, Chap. 24, Article 4 and particularly Sec. 14—11, Illinois Revised Statutes, it must be liberally construed towards the fireman or policeman; (4) that the discharge of an officer under the provisions of the act must be for "cause"; and finally (5) the decision of the administrative board is against the manifest weight of the evidence.

A resume of the facts show that in January of 1952 a Miss Nedra Ellsworth was going home from the business district of the City of Mattoon between 9:30 and 10:00 P. M. when an unidentified man assaulted her and beat her with a brick or other object, as a result of which she was seriously injured. The attack occurred in the 1400 block of Lafayette avenue in that city. On January 29, 1952 a meeting to plan strategy was held at the police department. The appellant, Paul Hammers was present and there were other officers also present. A plan was adopted which required placing of several officers in private cars in the vicinity in which the attack had occurred. Officer Heckwine was

222

to be "designed as a woman and serve as a decoy." The arrangement was set up so that the department would have approximately four men or more who could constantly watch and observe the decoy officer as he walked along the sidewalk in the danger area. Heckwine was to continue to walk the area, and it was on his fifth trip when he was assaulted. "After the trap" should have been sprung following the assault on Heckwine in his female attire, it was found that the plaintiff, who was an alerted officer participating in the plan, had left his post of duty. In the assault Heckwine sustained a blow on the side of the head which raised a knot about half the size of a hen's egg and the assailant escaped.

Among the officers who participated in the execution of the plan was the plaintiff, Paul Hammers and officers, Creek, Plummer and Baker, as well as others including the sheriff and his deputies. Hammers was a senior city patrolman. He and Baker were in Hammers' car on the evening of January 30, 1952 as a part of the execution of the plan to trap the assailant. They were located just south of Lafayette avenue on 15th street, a few feet west of where Miss Ellsworth had been attacked. They saw Heckwine walk past them. Baker saw him three times. The car radio was on and the windows were open. At about 9:30 P. M. or shortly thereafter Hammers told Baker it appeared that it was all over and he had to go home and dress in his uniform to go on duty at 11:00 P. M. Baker stated that he believed they should stay and further testified he understood the Chief would come by and advise them when to leave. Nevertheless they drove around the block to where officers Plummer and Creek were located at their post of duty and Hammers stated to them that he thought it was all over, in consequence of which Plummer and Creek left. After the plaintiff had left his assigned post of duty, Heckwine was assaulted about five or ten feet from the alley. Heckwine saw the at-

tacker, drew his gun and fired two shots but the assailant escaped. A search of the area was made without success. The Chief of Police, Larkin Jones returned to headquarters and telephoned the plaintiff who shortly thereafter reported at the police station. The Chief of Police released Hammers from duty and told him to go home.

On February 1, 1952 the Chief submitted to the chairman of the Board of Fire and Police Commissioners a set of charges which constituted the charge upon which the plaintiff was tried in this proceeding.

The plaintiff admitted he attended the meeting on January 29, 1952 in the office of the Chief of Police concerning the setting of the trap for the night of January 30th following, but he said that the Chief did not give any directive in his presence concerning the time when the men were supposed to leave their post of duty. He further testified that Edward Horn, captain of the police force was present. Horn testified that he was present in the Chief's office on the 29th of January, and all men were notified either on the evening the decoy was to be put out or on the evening prior thereto as to where they were to be stationed. Their instructions were that they were to have the windows of their cars down and a signal, the blowing of a police whistle, would indicate that there was trouble and the decoy had been assaulted. The headlights were to be out. He further testified that the officers would remain there until they were given orders to leave.

The appellant was tried by a Board of Fire and Police Commissioners of the City of Mattoon on six charges, the first and second of which was the complaint of Larkin Jones, Chief of Police, and the third, fourth, fifth and sixth charges were withdrawn or held by the Board to have not been established. The first charge is the communication received by the Board from the Chief of Police and the second was that on January 30, 1952 the appellant, while a police officer,

224

used profane and abusive language toward the Chief of Police and committed acts of insubordination towards the said Chief, a part of which is incorporated in the complaint made by the Chief.

It is true that the specific charges numbered one to six were signed by the Board of Fire and Police Commissioners of the City of Mattoon. Complaint is made by the appellant that because the charges were signed by the Board, they are disqualified to sit at the hearing. Article 14, Chap. 24, being secs. 14—1 to 14—17 inclusive, 1951 Illinois Revised Statutes provides for the adoption of the optional Fire and Police Commissioners Act in cities of less than 100,000 inhabitants and also in cities, villages and towns of 13,000 inhabitants and not more than 250,000, which is not subject to an "Act to regulate the civil service of cities" and provides for the appointment of a board of fire and police commissioners, qualification of the members, rules of conduct of the examination of firemen and policemen and their removal and discharge. Sec. 14—11 provides that no officer or member of the fire or police department of any municipality subject to the act "shall be removed or discharged except for cause, upon written charges, and after an opportunity to be heard in his own defense. These charges shall be investigated by the board of fire and police commissioners, and in case any officer or member is found guilty, the board may remove or discharge him, or may suspend him not exceeding ten days without pay. The board may suspend any officer pending this investigation, but not to exceed thirty days at any one time. In the conduct of this investigation, each member of the board shall have power to administer oaths and affirmations, and the board shall have power to secure by its subpoena both the attendance and testimony of witnesses and the production of books and papers relevant to the investigation."

The only question before this court involves the charges made by Larkin Jones, the then Chief of Police

225

of the City of Mattoon under date of February 1, 1952. No other question is before this court for review. In our former opinion we merely held that inasmuch as the plaintiff had not been furnished with a copy of the charge and an opportunity to defend himself he had not had a hearing contemplated by the statute and the cause was reversed. The merits of the matter were not disposed of by this court. Thereupon the complaint contained in the letter of the Chief of Police was incorporated in a charge together with certain other charges, which were later withdrawn or held not substantiated. Plaintiff was served with a copy of the charge and a date was set for the hearing.

■ The Board of Fire and Police Commissioners was not in fact in this case the accuser, but it was the Chief of Police, Larkin Jones. The only connection the Board had with the charges upon which the plaintiff was tried and found guilty was to have them written down and personally served in conformity with the statute. In Tarr v. Hallihan, 375 Ill. 38 the complaints were filed with the Department of Registration and Education against certain licensed dentists by a regular employee of the department at the request and direction of the department. It was argued that while the hearings were had before the dental examining committee, its personnel was chosen by the director, and while the director may not enter an order of revocation except on the action and written order of the committee, he has the right to send the case back to the same committee or a new committee whenever he disagrees with the conclusions and recommendations of the committee. From this it was contended that the director can control the action of the committee by continuing to resubmit the cause until a recommendation satisfactory to him is had. It was contended further that in this connection the director was accuser, prosecutor and judge. At page 40 of their opinion the court say: "We are unable to agree with appellants'

226

contention that the procedure is lacking in due process because the complaints were signed by an employee of the department. That appellants are entitled to a hearing before an unbiased tribunal is not questioned. However, the mere fact that charges are made by an employee of the department does not, in our opinion, establish that the dental examining committee would be prejudiced against appellants."

In Pipe Trades, Inc. v. Rauch, 2 Ill.2d 278, it is said at page 289: "Looking to the first contention, the argument advanced seems to be that due process of law means judicial process, a premise long since rejected by State and Federal courts. (Citations.) Insofar as due process of law arises in public administrative law, the rule is concisely stated in 42 Am. Jur., Public Administrative Law, Sec. 116, as follows: 'While the constitutional guaranty of due process of law, the object of which is to preserve personal and property rights against the arbitrary action of public officials, applies to administrative as well as judicial proceedings, due process is not necessarily judicial process, except in the case of punishment for crime, and all the formalities of judicial proceedings are not essential to constitute due process of law in an administrative proceeding.' The same section, and many of the cases cited therein, tells us that administrative process by a board, executive or administrative officer, is as much due process as is judicial process, particularly when judicial review of the administrative action is provided." Again the court say at page 290: "Thus, the requirements have been fully met in this case for it is unchallenged that appellant had notice and a hearing, and, further, it is apparent that a full process of judicial review has been available before the administrative order becomes final."

██ It is next contended that under the provisions of the statute the officer must be discharged for cause. It will suffice to say without again quoting from the

227

statute that no officer or employee where the Fire and Police Commissioners Act is in force can be removed or discharged except "for cause," after written charges and after an opportunity to be heard in his own defense. In the case of Heaney v. City of Chicago, 117 Ill. App. 405 at page 411 it is said: "This, of course, implies that the written charges must state a 'cause' for his removal, which must be some substantial shortcoming which renders his continuance in his office or employment in some way detrimental to the discipline or efficiency of the service." Again it is said at page 411: "That negligence and incompetency on the part of an officer in regard to some particular work which it has been his duty to do or to supervise and look after, are causes for which the Commission may properly allow a removal, cannot be seriously doubted. To hold otherwise would be to make of the Civil Service Act something very different from what the Legislature intended, and a menace instead of a protection to public interests." While that case involved the administration of the Civil Service Act it is so much like the present case involving Sec. 14—11 of Chap. 24 of Illinois Revised Statutes that the holding of the court there is controlling here.

It is next contended that the decision of the administrative board is against the manifest weight of the evidence. The Chief of Police testified that Miss Ellsworth was assaulted in the 1400 block on Lafayette avenue and on the 29th day of January 1952 they worked out a scheme at the police station for trapping the assailant. Captain Ed Horn, Paul Smith, who was the radio operator for Coles county, Mike Dowling, the sheriff, Paul Hammers and McDuffy were all there and two or three other men. The plan was discussed with them and each was to have a part. "We determined to lay the trap the next evening." On January 30th they started the trap at nine o'clock. "I told the officers where to place their cars, and officers, Hammers and

228

Baker, had their car south of Lafayette avenue and headed north on the east side of the street approximately fifty or one hundred feet back of the intersection of 15th Street and Lafayette Avenue. Heckwine was designed as a woman." The Chief would pick him up at 12th and Lafayette and haul him up to the alley by the Madison theater and Heckwine would proceed on his tour down south 15th street to Lafayette avenue, east on Lafayette to 12th street and the Chief would pick him up there and haul him to the alley back of the theater. "The arrangement was so we would have approximately four men or more where the decoy could be seen. The flood lights would furnish background for Hammers and Baker at their position. All the officers took their places on the evening of January 30th. Heckwine was on his fifth round at the time he was assaulted. At the meeting at the police headquarters on January 29th someone asked when they would quit. Someone, not even I, said, 'Let the chief come around and tell us,' and I said, 'Well, that's what I will do.' Two men who were sitting in the car at the corner of 15th Street and Lafayette could have seen the assault upon Heckwine at the alley between Wabash and Lafayette on 15th Street. The officers I found missing were Hammers, Baker, Creek and Plummer. All four were at the meeting on January 29th. After I found that Creek, Plummer, Baker and Hammers were off duty, I found officers Walker and Elder still on duty and the sheriff and his deputies had not left their station."

Edward Horn, captain of the police force testified he was present when the plans were drawn up with reference to the capture of the assailant of Nedra Ellsworth. That conference took place in the Chief's office. The officers were to be at their station about 8:30 and were to remain until they were given orders to leave. "I heard no instruction as to what time the service at the particular station would terminate, but being that

he (meaning the chief) is my superior officer, that would be for him to tell me when to leave or the officer with me or any other officer, because he was in charge of the detail, not me."

John Baker, a patrolman testified, that he had his advice from the Chief and it was his understanding that the Chief would "come by and advise each of us when to leave. My recollection is that Hammers was there, and I was in the car with Hammers on the evening of January 30, 1952, located just south of Lafayette Avenue on 15th Street. We could see Heckwine as he approached. We had the radio on and the windows open. I counted three times that Heckwine passed. He could have passed more than that. Officer Hammers said it appeared to him it was all over and he had to go home and dress and prepare to come back to work at eleven o'clock and said, 'I think we'll go' and we left and stopped and talked to officers Plummer and Creek. Hammers told Plummer and Creek that he thought the thing was over. I believe I stated that we should stay and officer Hammers said that he had to go home and get ready to come back to work at eleven o'clock."

It is true that there is also evidence in the record including plaintiff's that the officers assigned were not informed as to how long they were to remain at their stations. The fact is that Hammers knew they were laying a trap for a criminally inclined person who had made a vicious assault on a woman a few nights before. He also knew that his co-patrolman, Heckwine was disguised as a woman patrolling the particular street or streets involved, and might be assaulted by this person. He claimed that he was off duty at the time but had volunteered his services. Whether he did so volunteer is not material. He was assigned to a certain spot, he knew that the Chief of Police was in charge, and he had no right to leave his post of duty until he was advised so to do by one of his superior officers. If he had remained in that post, he and his companion

230

officer would have seen the assault, inasmuch as the scene thereof was within their view. Notwithstanding the admonishment of his companion, who thought they should remain, the plaintiff not only left his post of duty but he drove around the block and advised Plummer and Creek, co-patrolmen at their post of duty that he thought it was all over and was going home and as a result they also went home.

■ There is in this record substantial evidence that the plaintiff failed to remain at a post of duty assigned to him and thereby endangered the life of his fellow officer, Heckwine and disrupted the plan to apprehend the person who had theretofore viciously assaulted a woman in the City of Mattoon. Although as stated above there is conflict in the evidence, we do not believe that the order of the Board of Fire and Police Commissioners of the City of Mattoon is contrary to the manifest weight of the evidence.

■ Finally it is contended that inasmuch as no charges were lodged against officers Plummer and Creek the procedure before the Board may be attacked as contrary to the equal protection clause of the constitution. We do not believe there is any substance to the point thus made. Further, the plaintiff was a senior patrolman and it was at his suggestion that the matter was over and he was going home that led to their leaving their post of duty.

The judgment of the trial court is affirmed.

Judgment affirmed.