William E. Davern, Jr., v. Civil Service Commission of the City of Chicago, and Orlando W. Wilson, Superintendent of Police of the City of Chicago, Defendants-Appellants.

**Gen. No. 52,147.**

First District, Second Division.

September 23, 1969.

Raymond F. Simon, Corporation Counsel of City of Chicago (Marvin E. Aspen and Ronald S. Cope, Assistant Corporation Counsel, of counsel), for appellants.

Richard F. McPartlin, of Chicago, for appellee.

MR. PRESIDING JUSTICE LYONS delivered the opinion of the court.

The plaintiff, William E. Davern, Jr., an applicant for the position of patrolman in the Chicago Police Department, commenced this action by filing his complaint under the Administrative Review Act (Ill Rev Stats 1965, c 110, §§ 264–279 inclusive), seeking to reverse an order of the Civil Service Commission of the City of Chicago (hereinafter referred to as the Commission), which had disapproved his certification to the position of patrolman and had struck his name from the eligible list and Civil Service Register. After remanding the cause to the Commission for the taking of additional evidence pursuant to c 110, § 275(1)(g) and receiving a supplemental record in which the Commission affirmed its original decision of decertification, the trial court reversed the order of the Commission, holding it to be contrary to the manifest weight of the evidence, and ruled that the plaintiff was entitled to have his name immediately restored to the eligible list and register for the position of patrolman and was entitled to be certified and appointed to the position, to perform the duties thereof, and to receive the salary appropriated therefor, until removed as provided by law. The defendants appeal from this judgment and seek to reverse it.

The plaintiff passed an examination given by the Commission for the position of patrolman. On September 27, 1965, the Commission certified him for appointment

to that position. Shortly thereafter, the plaintiff received a letter, dated October 19, 1965, from the Chief Examiner and Secretary of the Commission which directed him to appear before the Commission on October 27, 1965, "to show cause why your certification to the position of Patrolman should not be disapproved." The plaintiff appeared as directed. He was without counsel and no witnesses testified against him. At this time, no attorney represented the Police Department. The plaintiff merely answered the questions asked of him by the Commission. These proceedings were informal and brief.

The plaintiff explained to the Commission that he resigned from the Chicago Police Department on May 10, 1960, at a time when he was assigned to the Summerdale Police District and was a patrolman having detective duties. At the time of his resignation he had been a member of the police force for approximately five years. He and his brother, also a patrolman and assigned to the same shift at the Summerdale Station as the plaintiff, resigned from the Police Department on the same date in deference to the wishes of their father, a physician, who thought it best that his sons leave the force due to the constant adverse publicity regarding the Police Department which he was receiving from his patients. Both the plaintiff and his brother then entered private industry until the plaintiff took the patrolman examination, apparently in 1965, and was certified for the position in that year.

During the questioning of the plaintiff by members of the Commission, it became apparent that the Commission had been advised by the Chicago Police Department that it recommended that the Commission disapprove the plaintiff's certification. At this first hearing before the Commission, its members referred to a Police Department report concerning the plaintiff which was not shown to him at this time and which indicated, according to the conclusions of an unnamed lie detector

examiner, that the plaintiff had lied when he answered "No" to the following questions put to him in 1960 during a polygraph examination given to him with his consent: "Did you ever receive any burglary proceeds since you were a policeman; did your detective partner at the Summerdale Police Station ever tell you that he actually knew Richard Morrison was working with policemen?"

The Commission also was advised by the Police Department that the plaintiff always denied being involved in any police wrongdoing and was never accused of any criminal offense as a result of the police investigation into the activities at the Summerdale Police District. At the conclusion of this informal hearing, the plaintiff was told that the Commission wished to take the matter under consideration and would advise him of its decision. Approximately a week later, the plaintiff was told by letter that, after investigation, the Commission had entered an order disapproving his certification to the position of patrolman and had struck his name from the eligible list and register. He did not receive a copy of this order; no reasons were given in the letter for this action of the Commission; and the investigation which it had conducted was not specified.

The plaintiff then filed his timely complaint in the Circuit Court of Cook County, pursuant to the Administrative Review Act, alleging the foregoing facts as well as stating that after receiving the letter of disapproval from the Commission, he had employed an attorney to ascertain the reasons for its action. He was informed that the Commission's files contained a letter which was signed by the Director of Personnel of the Chicago Police Department in his official capacity and was addressed to the President of the Commission. The complaint went on to allege that this letter contained information which formed the basis of the Commission's questions to the plaintiff concerning the alleged results of a lie detector

test which he had taken. The letter concluded with the recommendation of the Police Department that the certification of the plaintiff be withdrawn.

Continuing, the complaint alleged that at the time of his resignation in May, 1960, the plaintiff was assigned to the Summerdale Police District and, along with numerous other police officers, was subjected to intensive investigation; that the plaintiff cooperated fully in said internal investigation, submitted to a polygraph test, and testified before the County Grand Jury on two occasions; that the plaintiff resigned because of unfavorable publicity reflecting upon all personnel attached to the District and their families; and that there was no authority under Rule II, section 6 (Disqualifications from Civil Service) of the Commission nor was any competent, relevant evidence introduced against him at the hearing before the Commission which warranted its disapproval of his certification. In conclusion, the complaint prayed that, upon review of the transcript of the evidence supporting the order, the court would reverse the Commission.

The Commission filed an answer to this complaint and a transcript of the proceedings conducted before it. In its answer, it admitted most of the allegations contained in the plaintiff's complaint. It did deny, however, that it had no authority under its Rule II, section 6, to disapprove the plaintiff's certification and stated that the manifest weight of the evidence supported its order. Pursuant to order of court, a second hearing was held before the Commission on November 2, 1966, for the taking of such additional evidence as the parties wished to present. At this more formal hearing, both the Police Department and the plaintiff were represented by counsel. One witness testified for each side; direct and cross-examination were conducted by the attorneys; and documents were admitted into evidence. A transcript of these proceedings is also included in the record before us. The Police De-

partment did not pursue the original line of inquiry as to whether or not the plaintiff had lied while taking a lie detector examination in 1960, but rather now attempted to demonstrate, over objection of plaintiff's counsel, that the plaintiff carelessly, even deliberately, mishandled evidence, a Polaroid camera, in 1959 which aided Richard Morrison in that it halted any further criminal prosecution of him for the burglary of this camera.

The only witness for the Police Department was Marcus McGill, a sergeant in the Department, who testified that the plaintiff's name was mentioned as a result of the police investigation into the statements and allegations made by Richard Morrison. The plaintiff was a detective on April 14, 1959, the night that Morrison and Jerry Bossuyt were arrested in the Summerdale Police District. The arresting officers were Handley and Gilmartin. The detectives involved as investigating officers were the plaintiff, Kann, and Norcott. The following property was found in Morrison's car: a Polaroid camera; bottles of liquor; cigarettes; and approximately $475 in coins. The arresting officers and the detectives escorted Morrison, Bossuyt, and the seized property to the Summerdale Police Station where the evidence was inventoried. Through police channels, it was learned that the items matched a description of merchandise taken in the burglary of Carmen Sakol Motors, which was located in another Police District. Morrison and Bossuyt were then detained on a burglary warrant. Continuing, McGill stated that although the property seized should have been taken at the earliest possible time from the Summerdale Station to the Custodian's Office located in Central Police Headquarters, the merchandise remained at Summerdale for six days before it was sent to the proper place. In addition, the Polaroid camera was entered on Summerdale's Recovered Property Inventory Sheet without its serial number being listed. No detective placed

his private marking on the camera either. Police records showed that at the end of May, 1959, the plaintiff removed the camera from the Custodian's Office and kept it out for five or six days.

A document was then admitted into evidence over the objection of the plaintiff. It was a written report dated February 16, 1960, and sent from the Custodian's Office, Lost and Stolen Property Section, to the Deputy Commissioner of Police for Staff Services. This official police report indicated that a patrolman assigned to the Custodian's Office, noticing that the Summerdale Police Station's Recovered Property Inventory Sheet did not contain a serial number for the Polaroid camera, also could not locate it when the camera was turned in by the Summerdale District. He sought help from another patrolman assigned to the Custodian's Office who found the serial number by lifting a metal flap on the front of the camera and noticing the serial number, P120–459, stamped on the inside of this flap. This number was then entered on the appropriate police documents. The records in the Custodian's Office showed that the camera was removed on four occasions. These documents indicated which officer removed the evidence and when it was returned but apparently not who returned it. Officer Handley removed the camera on April 21, 1959, and it was returned the same day. Detective Glenn Cherry removed it on May 6, 1959, and it was returned the next day. The plaintiff took it out on May 27, 1959. The camera was returned on June 2, 1959. Finally, Officer Handley again removed it on September 24, 1959, and it was returned the same day.

On cross-examination, McGill testified that the plaintiff removed the camera from the Custodian's Office on May 27, 1959, so that it could be used in the court proceedings of that day. The witness went on to say that it was not normal procedure for a policeman to retain any evidence for five or six days after he had checked

it out for use in court as the plaintiff had apparently done in this case. In conclusion, McGill stated that one of the plaintiff's partners at the Summerdale District in 1959–60, Detective Kann, was still in the Police Department and had been promoted to sergeant.

The Police Department then introduced another document into evidence without objection from the plaintiff. This was a written statement taken from and signed by the plaintiff on March 22, 1960, in Central Police Headquarters and given to two investigating sergeants detailed from the Police Commissioner's Office. In his written statement, the plaintiff denied ever working with a burglar, knowing of any Chicago Police Officer who did work with one, receiving anything from a burglar to conceal a crime, knowing of Morrison's activities with police officers before January, 1960, or being told by his partner, Kann, that Kann knew Morrison was working with policemen.

The plaintiff also declared in his statement that sometime after May 7, 1959, he had a conversation with his two detective partners, Norcott and Kann, in Kann's hospital room. There the plaintiff told the other two men that on May 7, 1959, he had appeared at a preliminary hearing in the Cook County Criminal Courts Building concerning the burglary of Sakol Motors for which Morrison and Bossuyt had been arrested. Also present were Officer Handley, who was one of the arresting officers; William Sakol, who was the complaining witness; and Barsy, the attorney for Morrison. This lawyer contended that his client had a receipt for the Polaroid camera taken from his car by the police in April, 1959, which would show that this camera was Morrison's personal property and not that of Sakol Motors. Morrison produced a receipt from Imperial Jewelers which also contained a serial number. This number was compared with the number on the camera. They were identical. The prosecution's complaining witness, Sakol, then stated that he

had no receipt or bill of sale for the camera which would contain its serial number, but if the court would open the back of the camera, it would find there a positive of a picture taken by Sakol on Christmas, 1958. This was done. Upon examination, the court remarked that the photograph was hazy but it looked like Morrison's picture. Officer Handley, in response to the court's directive, sent the camera to the Police Crime laboratory for confirmation. The case was continued to May 27, 1959.

After this turn of events, Davern, Sakol, and Officer Handley engaged in a conversation outside the courtroom. The plaintiff asked Handley if he, as the arresting officer, had picked up the camera and brought it to court. Handley said no. Detective Glenn Cherry had volunteered to pick it up from the Custodian's Office on May 6, 1959, saying he would be down at Central Police Headquarters anyway on that date and would save Handley a trip downtown. Cherry brought the camera to Handley's home on May 6, 1959, and Handley brought it to court for the preliminary hearing on the following day. Following this conversation, the plaintiff and Norcott, one of his detective partners, went to Imperial Jewelers where the proprietor told them that he had sold a camera to Morrison in September, 1958, but he had no record of the sale nor of the camera's serial number. The proprietor also pointed out to Davern where the serial number could be found on a Polaroid camera. The camera's manufacturer also was contacted but it too kept no such serial number data.

In conclusion, the plaintiff mentioned in his written statement that he had no way of knowing if the Polaroid camera had been switched by someone. He saw no serial number on the camera when Morrison was arrested in April, 1959. He did not know of any serial number until May, 1959, at the preliminary hearing. The plaintiff took the Polaroid camera from the Custodian's Office to court on May 27, 1959, for the second hearing in this

101

matter. Since he had to attend another trial concurrently with the Morrison hearings, the plaintiff was required to divide his time between two courtrooms in the Criminal Courts Building. He left the camera in the possession of two men: Mr. Sakol, the complaining witness; and a detective, not from the Summerdale Station, who was with Sakol that day and whom the plaintiff did not know. After making five or six trips between courtrooms, the plaintiff was advised by Sakol that Bossuyt had been discharged. The court had stated that the camera should be returned to Morrison although he was held over to the County Grand Jury apparently for the burglary of the liquor, cigarettes, and coins. Morrison was no longer present.

The plaintiff then took the camera to the Summerdale Police Station. He did not return it to the Custodian's Office on May 27, 1959, since, due to the lateness of the hour, the Custodian's Office might have been closed by the time he arrived at the Central Police Headquarters. Once back at the Summerdale Station, the plaintiff placed the camera behind a desk so that it could be taken to the Custodian's Office by the pickup wagon. The plaintiff did this on the Thursday before the Memorial Day weekend. If the pickup wagon failed to deliver the camera to the Custodian's Office on that Friday, it would be quite possible that the Custodian's Office would not receive it until the following Tuesday due to the intervening Memorial Day weekend. The plaintiff also stated that he was on a medical leave of absence on May 27, 1959, due to a physical ailment, and he might have personally returned the camera to the Custodian's Office on June 2, 1959, when he received his medical release. The plaintiff did not see the camera again until his next court appearance in September, 1959.

After this document was introduced into evidence, the Police Department rested its case. The only witness for

the plaintiff was the plaintiff himself. He stated that during the five-year period that he was a member of the Police Department before his resignation in May, 1960, he was never suspended nor were any criminal charges placed against him. He did earn two creditable mentions and thwarted an armed robbery during this period. Detective Kann, one of his partners at the Summerdale Station, received a twenty-nine day suspension for his activities in the Morrison case. Kann was now a sergeant. The plaintiff went on to say that another detective, Glenn Cherry, had been convicted of switching evidence in the Morrison case. The plaintiff only took the camera from the Custodian's Office on May 27, 1959. In conclusion, he stated that the Police Department did not delay his furlough, but they did delay the furloughs of some of the other officers from the Summerdale Station who were later discharged from the force.

This concluded the additional evidence which was presented to the Commission. The Commission made no findings of fact but filed its supplemental record with the Circuit Court for the latter's consideration. The court thereafter reversed the prior order of the Commission.

On appeal, the appellants contend that the Commission was correct in concluding that the plaintiff lacked the requisite character for appointment to the Chicago Police Department. It is therefore urged that the trial court erred in substituting its judgment for that of the Commission. In its brief the Commission discloses, for the first time, its reason for decertifying the plaintiff. It contends that the record in this case demonstrates that the plaintiff is of "bad character" within the meaning of Rule II, section 6 of its Rules which, although not defining the term, provides as follows:

> "Disqualifications. Proof . . . of bad character . . . shall be grounds for . . . omission or removal from an eligible register. . . ."

Specifically, the appellants contend that the plaintiff is of "bad character" because: (1) he did not place the Polaroid camera's serial number on Summerdale's inventory sheet; (2) he was one of the recovering officers and did not place his mark on the camera; (3) he removed the camera from the Custodian's Office on May 27, 1959, and it was not returned until June 2, 1959; (4) he was not the arresting officer and hence violated the rules of the Chicago Police Department by removing the camera on May 27, 1959; (5) he resigned while under investigation; (6) the records of the Police Department indicate that he lied in making certain answers to questions posed to him in a polygraph examination.

■■■ Although "bad character" is not defined in Rule II, section 6, it should be stated at the outset that the Commission must have the power to decide what is bad character in a particular case justifying the decertification of an applicant for a Civil Service appointment. In the statute controlling the discharge, in certain municipalities, of Civil Service policemen and firemen for "cause" (Ill Rev Stats (1965), c 24, § 10–2.1–17), "cause" is not defined by the Legislature. In interpreting this statute, reviewing courts have held that the administrative agency is to decide what conduct justifies cause for removal. When the Administrative Review Act is invoked and the courts are asked to review a final decision of an administrative agency, the judiciary will not reweigh the evidence but will only determine if the order of discharge is not arbitrary but is just and reasonable in light of the evidence presented to the agency. Fantozzi v. Board of Fire and Police Com'rs, 35 Ill App2d 248, 256, 182 NE2d 577, 580 (1962) ; affirmed 27 Ill2d 357, 189 NE2d 275 (1963). It is the duty of this court, as it was of the trial court, to examine the evidence presented before the Commission and to determine if its order is supported by the manifest weight of that evidence. Drezner v. Civil Service Commission, 398 Ill 219, 226–27, 75 NE2d 303, 307 (1947).

The appellants first contend that the plaintiff's bad character is demonstrated by his failure to record the camera's serial number on Summerdale's inventory sheet. In this regard, it should be noted that the record fails to reveal why this duty should fall solely on the plaintiff. There were two arresting officers present at the scene of Morrison's arrest and two detectives participating in the investigation in addition to the plaintiff. Bad character is alleged only against the plaintiff although no one of these other four police officers thought to record the serial number either. Apparently, they are still on the police force. One of the detectives, Kann, has been promoted to sergeant.

In addition, it is undisputed in this record that the plaintiff did not discover the location of the serial number on a Polaroid camera until he himself interviewed the owner of Imperial Jewelers after May 7, 1959. Up until that time he only knew the identity of the camera found in Morrison's car as Model #110A. One of the police officers assigned to the Custodian's Office at Central Police Headquarters could not find the serial number when the camera was turned in on April 20, 1959. He had to seek help from another patrolman who discovered the number, somewhat hidden, inside the camera's flap, which first had to be lifted. The serial number was certainly not in plain view. It appears that a rather thorough and detailed examination was required to find it if one was unfamiliar with the camera. The record is silent as to why the duty to conduct such an examination should rest solely with the plaintiff. It would be arbitrary and unreasonable to place this duty solely on him in the absence of evidence showing that the plaintiff was the dominant figure among the detectives and arresting officers when Morrison was apprehended on April 14, 1959. No such evidence is found in this record.

Moreover, the record does not contain the serial number which was read in court on May 7, 1959, and which

was compared with Morrison's receipt and found to be identical. We do know that a certain serial number was found to be identical, but we do not know the identity of that serial number. If it was P120–459, then the camera was switched at the Summerdale Station during the six-day period from April 14 to April 20, 1959, since P120–459 was the serial number of the camera turned in to the Custodian's Office on April 20, 1959. Consequently, Detective Cherry would not have switched the camera sometime between May 6 and May 7, 1959. Yet, it is undisputed that Cherry was convicted of switching evidence in the Morrison case and that he volunteered to pick up the camera for Officer Handley, the arresting officer, on May 6, 1959. The switch was discovered the next day. It is somewhat apparent that the switch was not made until after the camera had reached the Custodian's Office on April 20, 1959. It is, therefore, immaterial that the camera was kept at the Summerdale Station from April 14 to April 20, 1959.

After learning on May 7, 1959, at the preliminary hearing, of the apparent switch in the evidence, the plaintiff did not remain idle but rather attempted to discover the serial number of the camera sold to Morrison. It is undisputed that he interviewed the owner of Imperial Jewelers in an unsuccessful attempt to gain this information. The manufacturer of the camera was also contacted, but to no avail. This was diligent police work. On the basis of the totality of these factors, we find that the manifest weight of the evidence does not support the contention that the plaintiff's bad character is shown by his failure to record the camera's serial number on Summerdale's inventory sheet.

The appellants contend that the plaintiff's bad character is also shown by his failure to place a mark on the camera. Rule 339 of the Chicago Police Department provides, in relevant part, that "all property coming into police hands which may be used as evidence in a criminal

106

case shall be properly marked by the recovering officer
. . . ." The term "recovering officer" is not defined in the
rule. Obviously, the recovering officer could be the arrest-
ing officer. In the instant case, two arresting officers and
three detectives accompanied Morrison, Bossuyt, and the
evidence to the Summerdale Police Station. The record is
silent as to who was the recovering officer. It is clear that
no officer or detective marked the camera found in
Morrison's car, although this would have aided in the de-
tection of any subsequent switching of the camera.
Again, the appellants seem to contend that the plaintiff
alone had the duty to mark this evidence. There were
four other officers present, including two other detec-
tives. The record is silent as to which of the detectives, if
any, was the recovering officer and hence had the duty to
mark the evidence. Neither of the other detectives, Kann
nor Norcott was called as witnesses by the Police De-
partment to explain who was the recovering officer on
April 14, 1959. Officers Handley and Gilmartin, the ar-
resting officers, also were not called as witnesses. If
these men were unwilling to testify, the Commission
could have used its subpoena power under Ill Rev Stats
(1965), c 24, § 10–1–18 to compel attendance. Apparently,
all four officers are still on the police force. Kann has
been promoted to sergeant. The police officer who did
testify before the Commission, Sergeant McGill, offered
no evidence on the point of who was the recovering offi-
cer on the night of Morrison's arrest. He merely testified
that no detective placed his private marking on the cam-
era. The evidence in this record does not support the
conclusion that the plaintiff was the recovering officer
and hence he had the duty to mark the camera. Thus, this
contention is without merit.

It is also urged that the plaintiff's bad character was
again shown when he removed the camera from the Cus-
todian's Office on May 27, 1959, and did not return it
until June 2, 1959. It is undisputed in this record that

107

the plaintiff went to court on May 27, 1959, although on a medical leave of absence. He offered a reasonable explanation for the failure of the camera to reach the Custodian's Office until June 2, 1959, which explanation stands uncontradicted in this record. It was his testimony that he either returned the camera himself on June 2 after returning from sick leave or the pickup wagon failed to obtain the camera from the Summerdale Station on May 28, 1959, and this failure, coupled with the intervening Memorial Day weekend, resulted in the camera not reaching the Custodian's Office until June 2, 1959. Furthermore, the switch in the camera had been discovered on May 7, 1959, so that the plaintiff's later actions would not be relevantly connected to the alleged earlier mishandling of this camera by police officers which enabled the switch to occur.

The appellants also contend that the plaintiff's bad character is reflected by the fact that he removed the camera from the Custodian's Office on May 27, 1959, in violation of Police Department Rule 338 since he was not the arresting officer. Rule 338 provides, in relevant part, that when property held as evidence is needed in court, the arresting officer may obtain it from the Police Custodian upon leaving the proper receipt and when the evidence is not disposed of in court, the arresting officer shall return the evidence to the Police Custodian. It is undisputed in this record that the plaintiff removed the camera from the Custodian's Office on May 27, 1959, although he was not the arresting officer. However, it is apparent from the record that the plaintiff did this because the arresting officers, Handley and Gilmartin, were not going to be present in court on that date for some undisclosed reason. The record reveals that the only parties present for the prosecution on May 27, 1959, were the complaining witness, Sakol, and the plaintiff. In light of this reasonable explanation for the plaintiff's action on May 27, 1959, it cannot be said that his alleged

108

bad character was shown by the fact that he checked out the camera on that date although he was not the arresting officer.

Also urged, as an example of the plaintiff's alleged bad character, is the fact that he resigned from the Police Department while under investigation. It is implied that he resigned as an alternative to charges being placed against him. There is no evidence of this in the record, however. Sergeant McGill, the police department's sole witness, offered no testimony in explanation of the plaintiff's resignation. The documents offered into evidence are also silent as to this matter. Any witnesses or documents that the police department needed to prove its case against the plaintiff on this point could have been subpoenaed by the Commission pursuant to its power under Ill Rev Stats (1965), c 24, § 10–1–18.

On the other hand, the plaintiff offered a reasonable explanation for his resignation—unfavorable publicity affecting the police assigned to the Summerdale Station and their families—which stands uncontradicted in this record. It is undisputed that the plaintiff cooperated fully with the police officers investigating the Summerdale scandal and that he was never suspended from the force nor were any criminal charges ever placed against him. His detective partner, Kann, now a sergeant, did receive a twenty-nine day suspension for his activities in the Morrison case. The plaintiff always denied being involved in any of the Summerdale wrongdoing and received his furlough before resigning, although the furloughs of other police officers from the Summerdale Station, who were later discharged from the force, were delayed. Since there is no evidence in this record to support the contention that the plaintiff resigned while under investigation so as to escape charges being placed against him, this contention is without merit.

Finally, the appellants urge that the plaintiff's bad character is shown by the fact that the records of the

Chicago Police Department indicate that he had received burglary proceeds and that he knew that his partner, Kann, was aware of police officers who were working with burglars. The basis of this contention is the letter sent to the Commission by the Director of Personnel of the Police Department containing the alleged conclusions of an unnamed polygraph operator that the plaintiff had lied in response to two questions asked of him during a lie detector examination. Since the letter was offered to prove the truth of the matters asserted therein but the unnamed polygraph operator, the out-of-court declarant, was not called upon to testify, this court is faced with a hearsay situation arising in an administrative agency proceeding. The Police Department never tendered the results of the lie detector test to the Commission as additional documentary evidence. Such action would have raised the issue of whether such results are competent evidence in an administrative agency proceeding to show the bad character of a police officer. In Seneca v. Board of Fire and Police Com'rs, 71 Ill App2d 219, 229, 217 NE 2d 320, 325 (1966), it was held that even if such results were competent evidence before an administrative agency, it would still be necessary to prove the qualifications of the person who administered the polygraph test. Such a foundation was not presented in the case at bar. However, because of the way in which the evidence was presented in this case, we are not called upon to decide this issue. Only the hearsay point is before this court.

█ In Novicki v. Department of Finance, 373 Ill 342, 344, 26 NE2d 130, 131 (1940), a suit by the Department of Finance for the assessment of a deficiency tax under the Retailers' Occupation Tax Act, it was held that hearsay is incompetent evidence in administrative agency proceedings. Involved in that case was a section of the Retailers' Occupation Tax Act which provided: "In the conduct of any investigation, or hearing, neither the Department (of Finance) nor any officer or employee

thereof shall be bound by the technical rules of evidence. . . ." In its decision that the Legislature by this section did not intend to abrogate the fundamental rules of evidence, the court held that the rule against hearsay is a basic and not a technical rule of evidence and is based on the necessity of an opportunity to cross-examine the out-of-court declarant. Fantozzi v. Board of Fire and Police Com'rs, 35 Ill App2d 248, 256, 182 NE2d 577, 580 (1962); affirmed, 27 Ill2d 357, 189 NE2d 275 (1963), a proceeding before an administrative agency to discharge a police officer for "cause" also held that hearsay is incompetent evidence and is inadmissible before an administrative agency. It is apparent from the cited cases that hearsay is not competent evidence in administrative agency proceedings. The trial court apparently came to the same conclusion and remanded the cause to the Commission for the taking of additional evidence. The appellants urge that the plaintiff waived any error by his failure to object to the admission of this hearsay evidence. Such a contention overlooks the fact that the plaintiff was not represented by counsel at this first hearing before the Commission and, more importantly, did not know that the alleged conclusions of the unnamed polygraph operator were contained in a letter from the Director of Personnel of the Chicago Police Department meaning that such purported conclusions were hearsay evidence and inadmissible.

The cases relied upon by the appellants are distinguishable from the instant case. The evidence in People ex rel. Jones v. Civil Service Commission, 17 Ill App2d 36, 149 NE2d 487 (1958); in Nolting v. Civil Service Commission, 7 Ill App2d 147, 129 NE2d 236 (1955); and in DeGrazio v. Civil Service Commission, 31 Ill2d 482, 202 NE2d 522 (1964), was far more convincing than the evidence in the instant case. In Rose v. Civil Service Commission, 14 Ill App2d 337, 144 NE2d 768 (1957), the reviewing court held that a probationary patrolman was not statutorily

entitled to a hearing before the Commission if, during his period of probation, he was discharged from the Police Department with the consent of the Commission after it had received in writing from the head of the department, the reasons for such a discharge. So too in the instant case, the plaintiff will become a probationary patrolman for a period of time not to exceed six months (Ill Rev Stats (1965), c 24, § 10-1-14), during which time he could be discharged, with the Commission's consent, if the head of his department follows the procedure authorized in the Rose case. In Coursey v. Board of Fire and Police Com'rs of Skokie, 90 Ill App2d 31, 41, 234 NE 2d 339, 344 (1967), the court held that a chief of police has the inherent authority as well as the implied authority derived from a Police Department Rule in that case to order a patrolman, accused of wrongdoing, to submit to a polygraph examination in a case in which a citizen's accusations were denied by the police officer. Since the patrolman disobeyed this order of his superior officer, it was held that the administrative agency was correct in discharging him for insubordination. The case at bar does not involve a refusal to take a polygraph examination but rather hearsay as related to the taking of such an examination.

The appellants briefly contend that the plaintiff, an applicant for appointment to the position of patrolman, is not entitled to the procedural safeguards of a patrolman enjoying Civil Service status guaranteed him by Ill Rev Stats (1965), c 24, § 10-1-18. Such a contention tends to overlook the fact that the plaintiff did voluntarily receive a hearing before the Commission and was given an opportunity to be heard in his own defense. Furthermore, the appellants do not dispute the fact that the plaintiff has properly invoked the Administrative Review Act. In light of these circumstances, we find no merit in this contention.

■ We have reviewed all questions of law and fact presented by the record before us. It is our opinion that the trial court was correct in holding that the order of the Commission was against the manifest weight of the evidence. The judgment is affirmed.

Judgment affirmed.

BURKE and McCORMICK, JJ., concur.