NICHOLAS MOLINO ET AL. *v.* BOARD OF PUBLIC SAFETY OF THE CITY OF TORRINGTON (No. 5916)

NICHOLAS MOLINO ET AL. *v.* CITY OF TORRINGTON (No. 5916A)

KING, C. J., ALCORN, HOUSE, THIM and RYAN, Js.

Argued October 14—decided December 21, 1966

*John A. Mettling,* with whom were *Paul Smith,* and, on the brief, *Jess H. Smith* and *Marcia B. Smith,* for the appellants (plaintiffs) in both cases.

*Joseph J. Gallicchio,* for the appellees (defendants) in both cases.

ALCORN, J. The three plaintiffs were suspended, without pay, from the Torrington police department by the chief of police and were thereafter ordered dismissed from the police force by the city's board of public safety, hereinafter referred to as the board. The board decided that the suspension was justified and that there was cause for the dismissal. The plaintiffs appealed to the Court of Common Pleas from the board's decision. In a separate action, returnable also to the Court of Common Pleas, they sought to recover, from the city of Torrington, unpaid salary claimed to be due them from the date of the suspension and of the dismissal, both of which were alleged to be illegal. The Court of Common Pleas dismissed the appeal and, in the action for unpaid salary, rendered judgment for the defendant city. Separate appeals have been taken from those judgments but have been argued together, although presented to us on separate records and briefs. The basic facts are such that a single opinion suffices for the two appeals.

We consider first the validity of the board's action in dismissing the plaintiffs as police officers.

Under the terms of the 1923 Torrington charter, the power to prescribe the duties of the police force rested with the board of councilmen. 19 Spec. Laws 466, No. 374 § 22. In 1930, the board of councilmen adopted a manual of regulations for the police department. In 1935, the control, management and supervision of the police department was vested in a newly created board of public safety consisting of the mayor, ex officio, and four resident electors appointed by him. 22 Spec. Laws 196, No. 337 §§ 1, 3. That authority has continued and now rests with the defendant board. The 1935 act empowered the defendant board to make all rules and regulations for the police department (§ 3) and further authorized it (§ 5) to suspend or remove a member of the department after a hearing on written charges served at least forty-eight hours before the hearing. The board has never, since its creation, adopted rules or regulations for the police department, which is still said to be functioning under the thirty-five-year-old regulations adopted by the councilmen. A reading of the police manual suggests that, if, in fact, the personnel of the department is required to follow the generally approved modern police procedures, its instruction must come from sources not appearing in the regulations before us.

The plaintiffs, who were patrolmen, were dismissed by the board for violations of specific sections of the regulations in the police manual. In our view of the case we may assume, without deciding, that the regulations in issue have continued to be operative even though the body which promulgated them has been superseded by the board. See *Shelton* v. *City of Shelton*, 111 Conn. 433, 438, 150 A. 811;

*Water Commissioners* v. *Johnson,* 86 Conn. 151, 166, 84 A. 727; *Hartford* v. *Hartford Theological Seminary,* 66 Conn. 475, 484, 34 A. 483; *Southport* v. *Ogden,* 23 Conn. 128, 130.

The basic facts, which are not in dispute, are as follows. At about 1:30 a.m. on September 3, 1964, the plaintiff Vance Williams was patrolling a beat on East Main Street in the business center of Torrington, "checking" doors and windows of business establishments. His tour of duty was from midnight until 8 a.m. The plaintiff Ugo Maniago was operating a radio patrol car on the same shift, and it was his duty to contact Williams at about 1:30 a.m. and drive with him to outlying areas where both men would "check" doors and windows. The plaintiff Nicholas Molino had completed a tour of duty at midnight and thereafter was out of uniform and not on duty.

At about 1:30 a.m. an official of Bartram's Auto Electric Company went to the company's combination garage, auto supply store and gasoline station at the corner of East Main and Willow Streets. There he found the patrol car and the three plaintiffs. Molino and Maniago were inside the building, and Williams was seated in the patrol car. The plaintiffs explained to him that Williams had discovered an unlocked door in the garage and had called on Molino, who happened to be driving by, for assistance in checking the premises. After a short conversation, the plaintiffs left, and the Bartram official personally looked over the premises and found nothing amiss. The plaintiffs did not report the incident to their superiors and made no diary entry of it. In the evening of the same day, the Bartram official reported the incident by telephone to the chief of police.

The chief of police immediately started to investigate. He talked to each of the plaintiffs and took tape recordings of the conversations in which the plaintiffs cooperated fully. He periodically reported the progress of his investigation to the board, and, at a special meeting, the board directed that the plaintiffs be asked to take a polygraph or so-called lie-detector test. At the direction of the board, the chief of police notified each plaintiff that he must take the polygraph test or be suspended. The plaintiffs refused to take the test, and the chief of police suspended Molino on October 7, 1964, Maniago on October 8, 1964, and Williams on October 15, 1964. The reason given each plaintiff was "refusal to cooperate in an investigation." Following the suspensions, the chief of police asked the state police to investigate, and the plaintiffs, on advice of counsel, refused to submit to further interrogation by the state police.

On October 12, 1964, the plaintiffs' attorney wrote to the chief of police, seeking the reason for the suspensions. On October 26, 1964, the chief replied by letter, stating that the charges leading to the suspension were violations of §§ 2, 46, 47, 52 and 72 of the police manual and a violation of "Rule VII, Section 9, of the 'Standards of Operation' manual" of the police department. Sections 2, 46, 47, 52 and 72 of the police manual appear in the footnote.[1]

---

[1] "[POLICE DEPT. ORDINANCE] Sec. 2. The primary duties of the several members of the police force of the City of Torrington, are to observe and enforce the laws of Connecticut and the ordinances of said City, relating to the preservation of the peace, protection of person and property from unlawful trespass or assault, obedience to, and enforcement of, the rules and regulations in force in said City, detection and apprehension of all crimes, obedience to the commands of their superiors in office in said police department and board of councilmen."

"[RULES AND REGULATIONS SUPPLEMENTARY TO . . . ORDINANCE,

"Rule VII, Section 9, of the 'Standards of Operation' manual" nowhere appears in the record before us and, therefore, cannot be considered.

A copy of the chief's letter was sent to the board, which held a hearing on the charges recited on November 10 and 11, 1964, at which the plaintiffs appeared. No issue is made of the fact that the charges were not served on the plaintiffs as required by 22 Spec. Laws 197, No. 337 § 5. On November 27, 1964, the board found the charges against each plaintiff proven and that their suspensions were justified, and it ordered each plaintiff "expelled and removed as a member of the Torrington Police Department."

The board had authority, under 22 Spec. Laws 197, No. 337 § 5, to suspend, expel and remove any member of the police department only "for cause found after hearing on charges made in writing." "Cause" implies a reasonable ground for removal as distinguished from a frivolous or incompetent ground. *Riley* v. *Board of Police Commissioners,* 147 Conn. 113, 118, 157 A.2d 590; *McNiff* v. *Waterbury,* 82 Conn. 43, 46, 72 A. 572. The sufficiency of the cause is for the board to decide, but the question

LAW AND CHARTER PROVISIONS CITED RELATING TO POLICE DEPARTMENT:] 46. He shall take notice of and report any suspicious circumstances that may occur upon his beat.

"47. He shall keep written within a diary, and enter therein the time and circumstances of any fact as to which it is likely or possible he may be called upon to testify.

. . . . .

"52. The efficiency of the Department depends largely upon the respect commanded by the upright and straightforward conduct of each member.

. . . . .

"72. Untruthfulness is a grave disqualification for the police service. Members of the Police Department are required to speak the truth at all times and under all circumstances. Failure so to do will subject the offending member to dismissal."

whether the cause assigned constituted, of itself, a ground for removal is a judicial question. Ibid. The plaintiffs claim, in substance, that, on the evidence before the board, the causes assigned were insufficient grounds to justify their dismissal. The question before us, therefore, is whether, on the causes assigned, the board acted arbitrarily, illegally or so unreasonably as to abuse the wide discretion with which it is vested. *Riley* v. *Board of Police Commissioners,* supra, 117; *Sullivan* v. *Martin,* 81 Conn. 585, 591, 71 A. 783. The burden of showing that the board acted improperly, rests, of course, on the plaintiffs. *Wilber* v. *Walsh,* 147 Conn. 317, 320, 160 A.2d 755; *Riley* v. *Board of Police Commissioners,* supra.

It is important to note at the outset that none of the plaintiffs was, at any time, accused of any criminal activity. It is also noteworthy that they were not charged with insubordination or with any immoral or antisocial conduct. The manner in which they were alleged to have violated the various sections of the police manual was, in each instance, explicitly set forth. They were charged with having violated § 46 of the regulations in the police manual by failing to report the discovery of "an open door" at the Bartram property. The evidence was that the door was found to be unlocked, not that it was open. Section 46 requires the officer to report "any suspicious circumstances that may occur upon his beat." Another section of the regulations in the manual, namely, § 42, deals with the officer's duty as to doors and windows. That section provides that "[h]e shall during the night season examine carefully all the doors, gates and low windows on his beat where, in his opinion, extra care is needed, and see that they are properly secured." No report is

required by that section. A reading of §§ 46 and 42 together would indicate that the "suspicious circumstances" concerning which a report is required under § 46 contemplate something other than an unlocked door. The unlocked door was reported to the Bartram official when he came on the premises. Since he was capable of correcting the situation immediately, the action of the plaintiffs would seem to fulfil their duty under § 42. The evidence did not support the charge that they violated § 46.

The plaintiffs were charged with violating § 47 of the regulations in the police manual by failing to make a diary entry concerning "an open door." Section 47 requires a diary entry to be made concerning a fact about which it is likely or possible that the officer might be called upon to testify. As already indicated, the evidence was that Williams had discovered an unlocked door, not an open door. Neither the plaintiffs nor the Bartram official, who was with them on the premises, found anything amiss. These circumstances were not such as to raise a reasonable belief that any fact existed about which the plaintiffs would be called upon to testify. A diary entry, therefore, was not required of them.

The plaintiffs were charged with violating § 72 of the regulations in the police manual by refusing to take a polygraph test. There is nothing in § 72 which required them to take the test. The section requires only that members of the police department be truthful at all times. The plaintiffs had already talked freely with the chief of police concerning the circumstances under investigation, and their statements had been recorded. There is no evidence that anyone claimed that they had been untruthful. The unreliability of the polygraph test has resulted in its universal rejection as competent

legal evidence of truthfulness. See note, 23 A.L.R.2d 1306, 1308; 20 Am. Jur., Evidence, § 762. The plaintiffs were not charged with a refusal to obey an allegedly valid order to take the polygraph test, as was the case in *DeVito* v. *Civil Service Commission,* 404 Pa. 354, 359, 172 A.2d 161, in which the court held that the refusal to obey such an order was not a just cause for a dismissal, or in *McCain* v. *Sheridan,* 160 Cal. App. 2d 174, 177, 324 P.2d 923, and *Frazee* v. *Civil Service Board,* 170 Cal. App. 2d 333, 335, 338 P.2d 943, in which dismissals were upheld because of such refusals where the officers involved were implicated in a crime, or in *Fischera* v. *State Personnel Board,* 217 Cal. App. 2d 613, 621, 32 Cal. Rptr. 159, in which the dismissal was upheld although there was no accusation of crime. The refusal to take the polygraph test was not a violation of § 72.

The plaintiffs were charged with a violation of § 2 of the police department ordinance in the police manual in that they failed "to properly check out the [Bartram] premises." Section 2 is a general declaration of the duty of police officers to enforce the law. The evidence before the board was that the plaintiffs, or at least two of them, claimed to be looking over the premises when the Bartram official arrived and chose to examine the property on his own account. This evidence established no violation of § 2.

Finally the plaintiffs were charged with violating § 52 of the regulations in the police manual because the alleged violations already enumerated "constituted a refusal to cooperate in an investigation of a possible theft or burglary" at the Bartram property and exposed the reputation of the police department "to suspicion and scandal." The substance of

§ 52 is that the efficiency of the police department depends largely on respect engendered by the upright conduct of its members. The chief of police testified that the plaintiffs cooperated fully in the investigation except for the refusal to take the polygraph test. The unreliability of that test as a proof of truthfulness has been alluded to. Their refusal to be interrogated by the state police came after they had already been suspended. Their failure to report, to make a diary entry, and to check the premises fully all antedated the investigation. It is not at all clear how these actions, singly or together, constituted a refusal to cooperate in the investigation or how these actions could expose the reputation of the department to suspicion and scandal. It is more readily understandable that unfavorable publicity arose, if at all, as a result of the hearing at which these charges were aired.

While the rectitude of police officers is of vital concern, the difficulties of their task and the seeming embarrassments into which the performance of their duties may lead them demand a careful weighing of charges made against them. Dishonest or illegal actions by an officer sworn to uphold the law deserve the strictest treatment. Discipline is essential. But both discipline and penalty must fit the case. We conclude that the charges assigned could not, on the evidence before the board, constitute proper grounds for dismissing the plaintiffs.

We turn now to the action in which the plaintiffs seek to recover unpaid salary. The complaint is in two counts. The first count alleges, in substance, that the suspension of the plaintiffs by the chief of police was illegal, and it seeks recovery of unpaid salary from the date of each officer's suspension by the chief of police until November 10, 1964. This,

as stated above, is the date of the commencement of the hearing by the board. The second count alleges that the board acted illegally in expelling the plaintiffs from the police force. In this count it is alleged that the illegal action has deprived the plaintiffs of their respective salaries as policemen and that they "have suffered loss thereby, and will continue to suffer loss until the termination of this action." Each plaintiff claimed damages of $1000 on the first count and $3000 on the second count.

The city's answer denied the illegality of the suspension alleged in the first count and the illegality of the expulsion from the police department alleged in the second count. The trial court found the issues for the city. At the plaintiffs' request, the trial court made a finding. The conclusions of fact in the finding are confined to supporting the legality of the suspension of the plaintiffs by the chief of police. The finding recites also that the only claims of law made by the plaintiffs at the trial related to the asserted illegality of the action of the chief of police in suspending the plaintiffs. The only error assigned and briefed concerns the same issue, namely, the legality of the suspension of the plaintiffs by the chief of police. Consequently, the situation resolves itself into an appeal from the judgment on the first count. No appeal from the judgment on the second count is before us.

The only question, then, is the correctness of the trial court's action in denying to the plaintiffs a recovery of their respective salaries from the date of their respective suspensions until November 10, 1964. The city, in its answer, has admitted that the plaintiffs have not received their salaries for this period.

The salary of a police officer belongs to him because the law attaches it to the office which he holds, so that, when he is wrongfully suspended, he is entitled to recover the salary accruing during the period of his unlawful removal from office. *McKeithen* v. *Stamford,* 149 Conn. 619, 621, 183 A.2d 280; *McDermott* v. *New Haven,* 107 Conn. 451, 453, 140 A. 826. There is no dispute between the parties over the fact that the chief of police suspended the plaintiffs because the board instructed him to do so if the plaintiffs refused to take a polygraph test. The board had the power to issue such instructions because it had the power to prescribe the duties of the chief of police. 22 Spec. Laws 196, No. 337 § 3. Since the chief of police was acting under the direction of his superiors in ordering the suspensions, it is entirely immaterial whether, under the regulations in the police manual, he could have suspended the plaintiffs on his own initiative under the rule of cases such as *McKeithen* v. *Stamford,* supra, 624. Under the authority vested in it by § 5 of the special act just referred to, the board could suspend a member of the police department only after a hearing on charges made in writing. It had no power to convey a greater authority to the chief of police as its subordinate. Consequently, the suspension ordered by the chief at the direction of his superiors, without a hearing on written charges, was illegal, and each plaintiff is entitled to recover his unpaid salary from the date when he was suspended. The terminal period for that recovery has been voluntarily fixed by the plaintiffs at the date chosen by them in their complaint, namely, November 10, 1964. There is nothing in the record before us from which the amounts to which the several plaintiffs are entitled for this period may be deter-

mined, and consequently the case must be remanded to the Court of Common Pleas to resolve that limited issue.

There is error in both cases; the judgment in the first case (No. 5916) is set aside and the case is remanded with direction to render judgment sustaining the appeal and reinstating the plaintiffs in the positions from which they were dismissed; the judgment in the second case (No. 5916A) is set aside and the case is remanded for further proceedings in accordance with this opinion.

In this opinion the other judges concurred.