William Coursey, Plaintiff-Appellant, v. Board of Fire and Police Commissioners of the Village of Skokie, Illinois, and Kenneth B. Chamberlain, Chief of Police of the Village of Skokie Police Department, Defendants-Appellees.

Gen. No. 50,682.

First District, Third Division.

November 30, 1967.

Gene J. Shapiro and Edward G. Raszus, of Chicago (Gene J. Shapiro, of counsel), for appellant.

John E. Toomey and Lee M. Burkey, of Chicago, amici curiae.

Marvin J. Glink, of Chicago, for appellees.

MR. JUSTICE DEMPSEY delivered the opinion of the court.

William Coursey, a policeman of the Village of Skokie, was charged with several violations of its police department's rules. After a hearing before the Board of Fire and Police Commissioners he was discharged from service. He filed suit for administrative review. The trial court affirmed the board's decision and he has appealed.

The charges against Coursey were based upon his conduct in regard to certain juvenile violators of the village's curfew ordinance, his failure to report the incident fully and his refusal, during the subsequent investigation, to take a polygraph examination. It is his position that the findings of the board were arbitrary, capricious and contrary to the manifest weight of the evidence.

On the night of April 25th and the early morning of April 26th, 1964, Coursey was on duty and assigned a

specific beat to patrol in his squad car. Shortly after midnight, while making his rounds, he stopped at a bowling alley to check for violations of the curfew. The manager of the alley told him that a young boy was alone in a car in the parking lot. Coursey went to the car to question him. The boy, 13 years old, told him he was waiting in the family car for his sister and her girl friend. Coursey took the boy inside the bowling alley while he looked for other violators of the curfew. About half an hour after midnight an automobile with two teenage couples in it entered the parking lot. The boy said he thought the auto was the one his sister was in and that she had been "out whoring around." He also used other vulgarisms. Coursey asked if one of the occupants of the auto was the boy's sister and Cathy, 17 years old, said that she was. She told Coursey that her brother had been left behind because he had been causing trouble and using foul language. Coursey told them they were in violation of the curfew, asked if they had identification cards and wrote down their names, addresses, ages and telephone numbers. He reprimanded them and told the boys to go home. He offered to take the other girl, Helen, home and said he would explain to her parents why she was late coming in. Helen said she had come with Cathy and would leave with her. Coursey then said he would follow to make sure she arrived without hindrance. He escorted the car to Helen's home in Morton Grove without having requested permission to leave Skokie. At Helen's home he again said that he wanted to speak with her parents but she told him that her parents were in bed. He then told her to tell Cathy to meet him at the parking lot of the Niles Township High School so that he could talk to her about the language her brother was using.

The evidence as to what transpired at the high school parking lot is conflicting. Coursey's testimony before the board follows: Cathy and her brother met him at the

34

parking lot. He called the boy over to the squad car and asked him about the vulgar words he was using. After talking about five minutes, he told the boy to tell Cathy to come over to the car. He questioned her about the boy's language and suggested that she tell her mother about it. He talked to her for five to seven minutes and then, about 1:45 a. m., she and her brother drove away. He followed their car for a short distance and continued his patrol when they turned off.

Cathy and her brother related a very different version of what took place. The boy testified that Coursey called him into the squad car, asked him why he called the girls the names he did and if he knew the meaning of the words. He was then told to send his sister over to the squad car. Cathy stated that her brother came to their car and said Coursey wanted to talk to her. She entered the squad car and Coursey asked where her brother learned that language. He asked how broadminded she was and if she "ever had it." He asked her to conduct an experiment to help her brother: to expose herself to him, to let him touch her and to keep a record of their reactions. Shortly before the conversation ended, Cathy asked what time it was and was told it was 2:00 a. m. When she returned to her car, she drove away and Coursey followed. Several blocks later he signalled for her to stop; she did so and then entered the patrol car. He told her to start the experiment immediately, to unfasten her bra and let her brother touch her; he said, "Well, let me help you undo your bra." She refused, went back to her car and sped away. Coursey followed for a short time and then turned back.

When Coursey finished his eight-hour shift at 7:00 a. m., he returned to the station house and filed an "activity report." The report did not show that he had detained and questioned violators of the curfew or that he had left his beat or the village.

The following day, after completing his tour of duty, Coursey told his supervisor he was worried about an incident which happened the night before; that he had ejected some teenagers from the parking lot of a bowling alley and one girl said she would make trouble for him. Coursey said that was all that happened and that the manager of the alley was there at the time. He was told not to worry. He did not disclose that he had left his beat and that he had stopped the teenagers again in the high school parking lot.

Cathy, her brother and their mother made a complaint to the state's attorney and a police investigation began. Coursey was questioned by the state's attorney and a police detective and, according to the latter, did not attempt to withhold information from them. Shortly thereafter the chief of police sent Coursey a written order to submit to a polygraph examination. Coursey did not appear for the test. Soon afterward the following charges were placed against him:

(1) failure to obey the order directing him to take the polygraph examination;

(2) insubordination in failing to comply with the order;

(3) professional misconduct on the evening of April 25th tending to bring the police department into disrepute;

(4) leaving his assigned beat and duty without being relieved, and

(5) failing to properly complete his activity report for his period of duty from 11:00 p. m. on April 25th to 7:00 a. m., April 26th.

The Board of Fire and Police Commissioners found him guilty of all except the third charge; no decision was rendered on that charge because of the board's findings on the other four charges, but the board stated that his conduct on the night in question was unprofessional.

■■ The statute under which the board acted provides, in relevant part, that ". . . no officer . . . of the . . . police department . . . shall be removed or discharged except for cause. . . ." Ill Rev Stats, c 24, § 10–2–17 (1963). Although "cause" is not defined by the statute, the courts have construed it to be some substantial shortcoming which renders the employee's continuance in office in some way detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good cause for his no longer holding the position. Murphy v. Houston, 250 Ill App 385 (1928). The rule to be applied in determining whether the appellant is correct in his contention that the board's findings against him must be reversed is that a decision of an administrative agency is not to be set aside unless it is against the manifest weight of the evidence. Avent v. Police Board of City of Chicago, 49 Ill App2d 228, 199 NE2d 637 (1964).

■ The board's finding that Coursey was guilty of leaving his assigned beat and the village limits of Skokie without authorization is unexceptionable, for he admitted that he went to Morton Grove and that he did not have permission to do so. He explained that he felt it was his job to see that the teenagers got home. However, he did not explain why, having escorted Helen to her home outside of Skokie, he did not also accompany Cathy and her brother to their home which, too, was beyond his jurisdiction. Nor did he offer justification for his failure to obtain permission to leave his beat or his failure to radio the police station that he was departing from his assigned patrol. The gravity of his act is intensified by the fact that less than six months previously he had been reprimanded for a similar offense, advised that at no time was he to leave his beat unless authorized and warned that further conduct of this nature would result in more stern disciplinary action. Although there may be circumstances which would require a police officer to leave his

37

beat and would prevent his requesting permission or giving immediate notice to his superiors, they were not present in the situation confronting Coursey, on the evening of April 25th. The situation did not call for speedy and uninterrupted action from him; there was no emergency and he was not in pursuit of a known or suspected criminal. By leaving his beat and going out of the village without permission, Coursey disabled himself from responding quickly to whatever jeopardy might threaten the lives and property of those within his jurisdiction, and seriously weakened the plan of community protection established by his superiors. This conduct was detrimental to the discipline and efficiency of the police department, and the board's decision that this was cause for his discharge was not improper. Hammers v. Board of Fire and Police Com'rs, 10 Ill App2d 218, 134 NE2d 647 (1956).

The charge that Coursey failed to complete the activity report was based upon his failure to record his prolonged detention of Cathy and her brother and the circumstances under which he abandoned his beat. His explanation for not including these items in his report was that he did not think they were necessary. His report showed only that he made a "premises examination" at the bowling alley, one other "premises examination," and spent the balance of his period of duty—seven and a half hours—on patrol. The report was incomplete and the testimony indicated that Coursey's familiarity with departmental requirements should have apprised him of this. His immediate supervisor stated that the interrogation of the adolescents for a period of two hours should have been noted on the activity report. Another superior testified that the detention of juveniles in excess of an hour also should have been noted on the report. He testified further that all the Skokie police officers were advised of the importance of keeping a log of activities and of accounting for their duty time, and that he had discussed with

Coursey the procedure to be used in filling out the report. Coursey was familiar with the function of the report: to provide the administrators of the police department with the information necessary for an evaluation of the effectiveness of current practices and an assessment of the performance of each officer. His failure to include the names and addresses of the detained juveniles might not by itself have rendered the report incomplete, but his total suppression of the events occurring after his initial questioning of them made it inaccurate and misleading. The report not only did not disclose that a significant part of his time was taken up in questioning the teenagers; it also implied that during this time he was actively patrolling his beat. That Coursey violated a departmental rule and that the violation was serious was established by the evidence.

The board's finding that Coursey was guilty of insubordination in not taking the polygraph examination has been argued more extensively than all other points. Interest engendered by this finding brought requests for filing of amici curiae briefs; the requests were granted and briefs have been accepted on both sides of the issue. Epitomized, the arguments made by Coursey and in his behalf are these:

> He had the right not to take the examination; therefore, his refusal to take it was not insubordination and should not be regarded as an admission of guilt.

> Despite this, the invocation of his right colored the board's thinking on the other charges against him and was the real reason for the severe penalty imposed on him.

> The order of the chief of police was unauthorized by State statute, village ordinance or police department rule.

It was unnecessary because he had cooperated with his interrogators and had answered all questions put to him.

It was unreasonable because a polygraph examination is fallible and without probative value.

It was useless because the chief of police testified that the outcome would not have been used for or against him and the board conceded it would not have considered the result if the test had been taken.

It was unjust because willingness or unwillingness to take a polygraph examination is inadmissible in civil, criminal or administrative proceedings.

██ Illinois courts have held that disobedience to a proper order given by a superior officer is cause for discharge (Zinser v. Board of Fire and Police Com'rs, 28 Ill App2d 435, 172 NE2d 33 (1961)) and that an officer's refusal to sign an immunity waiver before testifying before a grand jury is ground for dismissal (Drury v. Hurley, 339 Ill App 33, 402 Ill 243, 88 NE2d 728 (1949), cert den 339 US 983; Moretti v. Civil Service Board, 2 Ill App 2d 89, 118 NE2d 615 (1954)), but there has been no Illinois decision as to whether a police officer's refusal to submit to a polygraph examination is cause for his discharge. There are decisions outside of Illinois which hold that it is and this also is the opinion of the Attorney General of Illinois: Fichera v. State Personnel Board, 217 Cal App2d 613, 32 Cal Rep 159 (1963); Frazee v. Civil Service Board, 170 Cal App2d 333, 338 P2d 943 (1959); Illinois Attorney General's Report and Opinions, No. 346 (1962). On the other hand, Stape v. Civil Service Commission, 404 Pa 354, 172 A2d 161 (1961) is to the contrary. Also, in administrative proceedings, the National Labor Board and the Board of Review of the Labor Department of Illinois have rejected an unfavorable infer-

ence of guilt from failure to take a lie test. Lone Star Co., 149 NLRB, No. 67, 1964, 57 LRRM 1365; Wieboldt Stores, Inc., 65–BRD–111; Montgomery Ward & Co., 65–BRD–112; Monogram Models, Inc., 65–BRD–113.

No question of the constitutional privilege against coerced self-incrimination is involved in this case. Coursey did not refuse to submit to the test on the ground that it might have resulted in his making self-incriminating statements which could be used against him in a subsequent criminal proceeding. Nor did the board derive any imputation of guilt from his refusal—for it made no finding concerning his alleged unprofessional conduct in relation to the juveniles. The precise issues, then, are whether the chief of police had authority to order him to take the examination and whether the order was reasonable and, if so, whether his refusal to follow the order was a proper reason for his discharge.

■■ The corporate authorities of each municipality may prescribe the duties and powers of all police officers. Ill Rev Stats, c 24, § 11–1–2 (1963). Although no rule of the Skokie Police Department specifically covers polygraph examinations, one of the department's rules is that the officer assigned to investigate a complaint by a citizen against a member of the department:

"... shall conduct a thorough and accurate investigation. Such investigation shall include formal statements from all parties concerned, when necessary and pertinent, ... and all other information bearing on the matter."

The authority of the police chief to order an officer to take a polygraph examination, and to determine when the order should be given, can be derived by implication from this rule. But more important than this, the authority of a police chief under proper circumstances to issue such

an order, like any other sound and reasonable order for the good of the service, is inherent in his position.

There may be circumstances wherein a superior officer's order that a subordinate submit to a polygraph test would be arbitrary, but here, with conflict between the juveniles' accusations and Coursey's denials, the order was reasonable. What is more, it would not have been useless. The case was of public interest (see Coursey v. Greater Niles Tp. Pub. Co., 82 Ill App2d 76, 227 NE2d 164 (1967)) and the citizens of Skokie were entitled to assurance that the village's police force was above reproach. The chief of police was confronted with a situation where public confidence in his department might be undermined by the accusations made against one of its members. The chief would naturally want his subordinate exonerated and his department vindicated. A successful lie test by the truth-asserting officer would be a long step toward these ends—for in the public mind the result of such a test is often conclusive. In a situation like this, arranging for a polygraph examination and requesting the officer to take it was neither unreasonable nor useless. The chief would expect the officer to pass the test, and publication of the anticipated result would, from the public's view, clear the officer and restore confidence in the department.

 The statutes prohibiting a court from requiring or suggesting that the defendant in a criminal trial or the plaintiff or defendant in a civil trial submit to a "polygraphic detection deception test" apply neither in terms nor in principle to a proceeding before a Board of Fire and Police Commissioners. (Ill Rev Stats, c 38, § 158-1 (1961); Ill Rev Stats, c 110, § 54.1 (1963).) The board is required to investigate the charges of misconduct placed against an officer, and in its investigation it has power to secure by its subpoena the attendance and testimony of witnesses. Ill Rev Stats, c 24, § 10-2-17 (1963). The board's assessment of the officer's fitness for the

responsibilities of police duty should be based upon all the information reasonably related to his fitness, and his willingness or unwillingness to submit to a polygraph test when accused or suspected of a crime, or of conduct detrimental to the police force, is certainly a factor to be weighed.

Effective and efficient operation of a police department requires that allegations of police misconduct be thoroughly investigated. The polygraph machine can be a useful investigative tool when the test is skillfully prepared and is administered and interpreted by a qualified person; while it is not accurate to the degree that absolute judgments can be made as to the veracity of the person tested (People v. Triplett, 37 Ill2d 234, 226 NE2d 30 (1967)) the results are often reliable within recognized limits. Thus, for example, the results of a polygraph examination may be of help in narrowing the field of persons suspected of an offense or may assist in a determination whether to commence disciplinary action when, as here, there is an accusation against a police officer which he insists is untrue. Be that as it may, the issue is not the accuracy of a polygraph examination, but Coursey's failure to take an examination.

■ The chief of police did not exceed his authority in ordering Coursey to take the examination and his authority was not arbitrarily exercised. As a private individual Coursey did not have to submit to the examination, but as a policeman he did not have the privilege of refusing; having refused, he forfeited any right he had to be retained on the police force because his refusal was in conflict with his obligation as a policeman to obey the order of his commanding officer. His refusal impeded the investigation of a serious charge affecting the whole police department as well as himself. To sustain his action would be to vitiate the systematic authority and discipline upon which proper enforcement of the law is dependent.

The evidence was sufficient to sustain all the factual findings made by the board. And it therefore became the board's responsibility to evaluate the gravity of the proved violations and to determine what disciplinary sanction should be imposed for the infractions of the police department regulations and the noncompliance with the instruction of the department's commanding officer. The decision to remove Coursey from the force was not capricious; it was reasonably related to his misconduct, to the discipline and efficiency of the department and to the maintenance of public confidence in the department.

The judgment of the Circuit Court upholding the decision of the Board of Fire and Police Commissioners of the Village of Skokie is affirmed.

Affirmed.

SULLIVAN, P. J. and SCHWARTZ, J., concur.