THE METROPOLITAN SANITARY DISTRICT OF GREATER CHICAGO, Plaintiff-Appellant, *v.* RONALD E. HUSTON *et al.*, Defendants-Appellees.

(No. 55263;

First District—January 4, 1973.

Allen S. Lavin, Dolphy T. McLaughlin, Caryl P. Bonotto, and Leon K. Wykell, all of Chicago, for appellant.

Coghlan & Joyce, of Chicago, for appellees.

Mr. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court:

In March 1966 the Metropolitan Sanitary District of Greater Chicago held a civil service examination for operating engineers. The examination was conducted by the personnel department under the direct supervision of Ronald Huston, the assistant director. He was given the responsibility of preparing, administering and scoring the examination for the more than 200 applicants.

An investigation which followed the examination revealed certain irregularities and culminated in Huston's suspension from his position in May 1966. In June of that year the director of personnel and the district's general superintendent filed charges against Huston with the district's Civil Service Board. The specifications which accompanied the charges accused him of willful and fraudulent conduct which brought the district's civil service into disrepute by failing to conduct an impartial examination, giving preferential treatment to some contestants, misgrading and not safeguarding the test papers, changing answers, removing answer sheets and substituting others in their place.

In April 1969, four months prior to trail, an amended statement of

charges was filed. The amendment repeated the statutes and the rules of the district under which the charges were originally brought: that an employee could be discharged if he failed to obey a proper order given by any superior; if his conduct in the course of an examination tended to bring the district's civil service into disrepute, and if he was guilty of conduct which tended to render his continued employment detrimental to the discipline, efficiency or reputation of the district's service. The specifications of wrongdoing, however, were limited to the broad accusation that Huston violated the rules by not properly administering, grading and scoring the examination.

The trial was held before the district's Civil Service Board which rendered a unanimous decision finding that the evidence did not sustain the charges. The charges were dismissed and the board ordered that Huston be restored to his civil service status. The district filed a complaint for administrative review. Huston moved to dismiss the complaint. The trial court denied the motion to dismiss but sustained the decision of the Civil Service Board. The district appealed. In this court it contends that the decision of the board and the judgment of the trial court were contrary to the manifest weight of the evidence.

The principal witnesses at the hearing were Huston (called as an adverse witness by the district) and Linton Godown, an examiner of questioned documents. The relevant facts elicited from the two witnesses are these:

Huston, a graduate of DePaul University with a bachelor's degree and a graduate of the University of Chicago with a master's degree in business administration, started to work for the Sanitary District in 1955 as a personnel technician. In 1962, when his position was that of examining technician, he was assigned the task of conducting an examination for operating engineers. The examination papers were kept in his office until 1964 when they were removed from his files and destroyed. Sometime between 1962 and 1965 the district engaged a personnel consultant named McCann. Huston and the director of personnel, Chester Kopec, worked with McCann in devising new rules to improve the civil service structure of the district. One of the improvements recommended by Huston and which was adopted was the tightening of the security system to insure greater secrecy in the identity of the candidates taking examinations.

Two or three days before the 1966 examination, Kopec and Huston were informed by William Brogan, the business representative of the Operating Engineers Union, that copies of the 1962 examination questions and the correct answers to those questions were in circulation. The 1966 questions were immediately checked against those asked in 1962

and 18 were found to be the same. The 18 questions were eliminated from the 1966 examination and new ones were substituted. Within the first hour of the 1966 examination 15 to 20 candidates withdrew. It was assumed that they left because they found the examination difficult.

After the 1966 examination McCann was again employed, this time to investigate irregularities in the examination. Huston was instructed to cooperate with McCann. In the course of his investigation McCann asked Huston to identify the person who had brought the copy of the 1962 examination to his attention. Huston said it was a confidence and did not divulge Brogan's name.

The examination was held at DePaul University Saturday, March 12, 1966. Monitors circulated through the corridors and were assigned to each room to prevent cheating or communication between the candidates. Huston, Kopec and Helen Davin, an examination technician, were present and were the officers in control. The examination papers were locked in a file cabinet in Kopec's office over the weekend.

The following Monday, while Kopec, Huston and Davin were sorting the answer sheets in numerical order, it was discovered that one set of questions (booklet No. 155) and one answer sheet (No. 155) were missing. Huston called the monitor who was in charge of the room to which the package of material containing No. 155 had been assigned. The monitor said that he had noticed that No. 155 was missing on the day of the examination. In the presence of Kopec and Davin, Huston reprimanded him for not having brought it to the attention of one of the control officers at that time. Davin, who prepared the packages for the room monitors, was of the opinion that No. 155 had been accidentally destroyed by her in making preparations for the examination. No further inquiry or investigation was made.

At Kopec's direction, Huston proceeded to grade the answer sheets. The examination consisted of 100 questions with five possible answers to each question. The questions were in booklets and the multiple choice answers were on separate sheets of paper on which the numbers of the questions, 1 to 100, were listed. A candidate would indicate his answer by filling one of five small circles opposite the number of each question, thus:

| Question No. | A | B | C | D | E |
|---|---|---|---|---|---|
| 44. | ● | ○ | ○ | ○ | ○ |
| 45. | ○ | ○ | ○ | ● | ○ |

The papers were graded by means of a form which was placed over each sheet. This form, or template, had holes punched in it which corresponded with those circles on the answer sheet representing the correct answers. If a circle as seen through the template had a pencil mark in it the

examiner would know that the candidate answered the question correctly. If the circle was blank, the examiner would know that the candidate answered the question incorrectly or had not answered it at all. In grading the papers Huston marked such blank circles with a red pencil. When he was through marking he removed the template and subtracted the total of the red marks from 100. The remainder represented the candidate's grade.

No one re-checked the grades computed by Huston. After the scoring was completed the papers with passing and failing grades were divided into two piles, the eligible list was posted and the candidates notified. One hundred and seventy-seven candidates failed the examination; of those who passed 15 had grades of 90 to 95; no candidate received a grade between 84 and 90.

The civil service rules provided a period of inspection during which a candidate could review his paper and check the accuracy of his grade. One candidate, who had been notified that he failed, protested. It was found that he had been given a passing grade and that the notice sent him was incorrect. It was assumed that his paper had been inadvertently placed in the failure pile. The eligible list was corrected accordingly. Huston questioned his assistants but did not find out how the mistake occurred.

Linton Godown, the handwriting expert, testified that he inspected all the answer sheets for the 1966 examination. He found four circles in which there was evidence that black marks had been made over red marks. He also found a red mark in a circle which was not exposed when the paper was properly covered with the scoring template.

Based upon this evidence the Civil Service Board made the following findings of fact and of law:

"Ronald E. Huston properly discharged the duties of the office of Assistant Director of Personnel and reasonably followed the directions of his immediate superior in the administering, grading and scoring of the examination of March 12, 1966.

The record herein is devoid of any evidence that Huston was guilty of wrongdoing, negligence, misfeasance or nonfeasance in the performance of his duties as Assistant Director of Personnel of the Metropolitan Sanitary District of Greater Chicago.

We have carefully considered the Amended Statement of Charges and the specifications set forth in support thereof and the testimony and evidence adduced at the hearing herein and we find that the record does not support the allegations contained in the Amended Statement of Charges."

The district takes sharp issue with the conclusions of its own Civil

Service Board. It points out that: Huston was instructed to cooperate with McCann and that he disobeyed this order by not identifying the person who informed him about the 1962 questions being circulated among the 1966 contestants; he made no effort to learn the names of the contestants who left the 1966 examination early; he was negligent in not investigating more thoroughly the reason why booklet No. 155 and answer sheet No. 155 were missing from the examination papers; he was negligent in not ascertaining why a candidate was notified he failed the examination when he had, in fact, received a passing grade; he gave no satisfactory explanation why 177 candidates failed the examination; he gave no satisfactory explanation why candidates did not receive a grade between 84 and 90, and he offered no explanation how the black markings came to be imposed over the red ones.

■■ The provisions of the Administrative Review Act (Ill. Rev. Stat. 1967, ch. 110, par. 264 *et seq.*), apply to all proceedings for judicial review of the Metropolitan Sanitary District's Civil Service Board. (Ill. Rev. Stat. 1967, ch. 42, par. 323.14.) The scope of review upon appeal from such decisions is limited. The findings of an administrative agency are to be held *prima facie* true (Ill. Rev. Stat. 1967, ch. 110, par. 274), and will not be overturned unless they are without substantial foundation (*Brewton v. Civil Service Com.* (1969), 115 Ill.App.2d 460, 253 N.E.2d 504), or against the manifest weight of the evidence. *Coursey v. Board of Fire and Police Commrs.* (1967), 90 Ill.App.2d 31, 234 N.E.2d 339.

■■ The Civil Service Board's findings of fact and law were not against the manifest weight of the evidence. The charge that Huston violated an order—by not divulging to McCann the name of the person who informed him that the 1962 examination questions and answers were in the hands of 1966 candidates—is hypercritical and captious. The name was known to Kopec, the director of personnel and, presumptively, to McCann. William Brogan, the business representative of the Operating Engineers Union, brought the information to Kopec. Kopec summoned Huston to his office and Brogan repeated his story. To assert that Huston impeded McCann's investigation by not revealing Brogan's name is absurd in face of the fact that Kopec, Huston's superior, knew the name himself.

It is suggested that an investigation concerning the 1962 questions might have led to greater security in subsequent examinations and that, consequently, Huston, did not live up to his responsibilities in not tracing the source of these questions. In this same connection, it is also suggested that he was negligent in not interviewing the candidates who departed from the 1966 examination without completing it, the theory being that these candidates were probably frustrated when they found out the 1962 questions were not repeated and that an investigation might

have thrown light on how these questions came into their hands. First, Huston was charged with misconduct in reference to the 1966 examination—not the 1962. Second, Huston asked Brogan, in Kopec's presence, to identify the person from whom Brogan obtained the copy of the 1962 questions; Brogan refused. Huston inquired, again in front of Kopec, if it would be possible to trace the source; Brogan replied that it would be impossible. Third, the locks on the cabinets in which the 1966 material was stored were changed at once. Fourth, Huston eliminated all the 1962 questions from the 1966 examination. Fifth, because of the secrecy which Huston himself devised, the identity of the candidates who left the examination early was not immediately available.

The district submits that the missing booklet and answer sheet (No. 155) should have alerted Huston to the possibility that in some future operating engineers' examination the 1966 questions might be available to the contestants. Upon learning that No. 155 was missing from the examination papers, Huston talked to the monitor responsible for the room to which No. 155 was assigned. The monitor said the booklet and answer sheet were not in the package he received at the start of the examination. Beyond reprimanding the monitor for not having informed one of his superiors, Huston did not pursue the matter. In this, he is said to have been negligent. It appears that he did not pursue the matter because his assistant, Mrs. Davin, acknowledged that she was at fault. She said that No. 155 was probably among the papers burned by her before the examination took place. Why this particular charge of negligence was leveled only at Huston and not at Mrs. Davin who prepared the packages and should have known what was in them, and not at Kopec who learned that No. 155 was missing at the same time Huston did and who by statute was empowered with control of all examinations, is not explained. Ill. Rev. Stat. 1965, ch. 42, par. 323.7.

Huston's explanation of how a successful candidate came to be erroneously notified that he failed the examination was simple and believable: the examination papers were sorted into two stacks, the passing grades in one, the failures in another; the successful candidate's paper had been accidently placed in the wrong pile. Although the posted eligible list had to be changed to accommodate the correction, it is difficult to see how making the mistake could be elevated into a charge of wrongdoing which would warrant Huston's discharge from his civil service position. And, once again, only Huston is condemned for the error despite the fact that Kopec, Davin and two other employees participated in sorting the papers.

Likewise, we do not perceive and it is not shown why Huston was responsible for 177 candidates failing the examination, for none receiving grades between 84 and 90, or for 15 receiving grades of 90 to 95. While

these results may have been unusual (Huston characterized them as strange but not suspicious) there was no proof of the significance of either the failures or the point spread, and they fall far short of sustaining an accusation of misconduct.

The only charge against Huston that has any merit pertains to the black and red markings on the answer sheets of five candidates. The five marks must have been made during or after the scoring. After Huston received the papers from Kopec the Monday following the examination, he kept them in his office. As far as the evidence discloses, only one other person had possession of them at any time thereafter. This was Mrs. Davin who performed various tasks before, during and after the examination such as preparing the scoring template, selecting questions, compiling the packages of question booklets and answer sheets for the room monitors, functioning as a control officer and helping in the preparation of the eligible list. When Huston finished grading the papers they were turned over to her for the purpose of breaking tie scores among the contestants. This was done by giving preference to those candidates who applied for the examination at the earliest date and hour. Her handwriting in green ink appeared on the more than 40 papers she handled.

In four instances black marks were placed over red ones; in one instance a red mark was placed in a wrong circle. Huston alone did the scoring and he used a red pencil. His procedure was to put a red mark in those blank circles which would have been filled with a black pencil had the candidate answered correctly. The alterations were made by someone using a black pencil. The possibility that someone other than Huston made the alterations cannot be overlooked. If he had wanted to improve the grade of four contestants there was no logical reason for him to mark a circle in red and then cover it with black; all he had to do was to place a black mark in the correct circle in the first place. The error more directly attributable to him was the red mark which appeared in the wrong circle. The evidence showed that this could not have occurred if the template had been held in the proper position during the scoring. Whether misplacing the red mark was done deliberately or carelessly, the primary responsibility was Huston's for it was his duty to score the papers accurately.

The grades of the four candidates whose answers were changed would, presumably, have been raised one point, and the grade of the candidate who received the red mark would, presumably, have been lowered one point. But there was no testimony that grades were raised or lowered; there was no testimony that the alterations affected the rank of the candidates; there was no testimony that the eligibility list had to be re-arranged because of the changed grades.

More than 200 men took the examination. If 200 contestants answered 100 questions, 20,000 questions were answered. Of these only four were changed. There were five possible answers for each question; thus there were 100,000 circles on the examination papers. Of these only one was improperly marked.

From this computation and from the fact that no readjustment had to be made in the eligibility list, it would appear that the five alterations were of little importance. Numerically they may not have been, but in their impact upon the reputation of the sanitary district they were of great importance. They proved that the security of the district's civil service examinations could be broken and that grades were susceptible of manipulation. Any error in a civil service examination which reflects upon its integrity is of grave consequence. Every contestant has the right to participate in an examination which is honestly conducted, impartially graded and securely safeguarded. He must have complete faith in the integrity of the examination and full confidence that no one will tamper with his paper or those of his competitors.

Whoever changed four wrong answers into right ones undermined confidence in the district's examinations and brought its civil service into disrepute. The original charges filed against Huston asserted that he was personally guilty of this. The amended charges stated that he improperly administered, graded and scored the examinations. The district maintains that it was Huston's direct duty to do everything possible to make certain no candidate received preferential treatment and that the evidence proved that he was responsible for the abortive attempt to give such treatment to four or five candidates. The evidence did not prove this. The district also contends that it did not have to prove that he was solely responsible for the irregularities or that he conspired with anyone; that it was sufficient to establish that irregularities occurred and that these were in violation of his duties and responsibilities.

■■ We believe something more is required before a civil service employee can be deprived of his livelihood. It is not enough if irregularities take place; it must be shown that the accused employee committed them himself or participated in their commission; or, if the employee holds a supervisory position, that he closed his eyes to their occurrence or, through gross negligence or inattention to duty, permitted them to occur without his knowledge.

■■ There was insufficient evidence that Huston was guilty of any of these acts personally or vicariously. The weight and credibility of evidence are exclusively the province of an administrative agency (*Price v. Sanitary Dist. of Chicago* (1970), 123 Ill.App.2d 2, 259 N.E.2d 613), and courts of review are limited to a determination of whether the

decision of the agency is just and reasonable in light of the evidence presented. (*Davern v. Civil Service Com.* (1970), 47 Ill.2d 469, 269 N.E.2d 713.) The finding of the Civil Service Board that the evidence did not support the allegations against Huston was not contrary to the weight of the evidence and we concur in the conclusion of the trial court that the decision of the board was just and reasonable.

The judgment of the Circuit Court is affirmed.

Affirmed.

McNAMARA and DIERINGER, JJ., concur.