**Tommy J. TALENT, Appellant,**

v.

**CITY OF ABILENE et al., Appellees.**

No. 4619.

Court of Civil Appeals of Texas, Eastland.

Sept. 14, 1973.

Rehearing Denied Oct. 5, 1973.

Robinson, Wilson & Holloway (James E. Robinson), Abilene, for appellant.

Quay Parker, Asst. City Atty., Abilene, for appellees.

WALTER, Justice.

Appealed from the 42nd Judicial District of Taylor County.

Our opinion and judgment rendered on June 8, 1973, is withdrawn and the following opinion is rendered in lieu thereof.

This is a substantial evidence case.

The nature and result of this case is accurately set forth in Appellant's brief as follows:

"TOMMY J. TALENT is a Senior Fireman with the Fire Department of the City of Abilene, Taylor County, Texas. The Police recovered a pickup from Fireman TALENT on the basis that it was stolen. Fireman TALENT reported

the recovery to the Firechief and subsequently reported the fact that he had been charged with an offense in connection with the pickup and has been released on bond. The Firechief and one BILL OLSON, Personnel Director and Civil Service Director, suggested, and Fireman TALENT did take his vacation leave. When TALENT'S vacation leave expired, and the charge had not been 'cleared up', the Firechief ordered TOMMY J. TALENT to submit to a polygraph examination. Upon advice of his counsel, TOMMY J. TALENT, refused and because of his refusal to submit to a polygraph examination, he was permanently dismissed from the Fire Department. By 'majority' vote, the Civil Service Commission upheld the Firechief and upon appeal to the 42nd Judicial District Court of Taylor County, Texas, the learned Trial judge upheld the decision of the Civil Service Commission."

Appellant contends the Court erred in not rendering judgment reinstating him as a fireman because the special order issued to Appellant was unreasonable and unrelated to his duties as a fireman. He further contends that the fire chief has no power or authority to order him to submit to a polygraph examination. He also contends that he was permanently dismissed in disregard of his constitutional rights and in disregard of the Civil Service Rules.

■ The order of the Firemen's and Policemen's Civil Service Commission of the City of Abilene is presumed to be a valid exercise of the power and discretion conferred upon it. Gerst v. Guardian Savings and Loan Association, 434 S.W.2d 113 (Tex.1968). If the findings of the commission had any reasonable basis in fact and were not arbitrary and capricious, its order must be affirmed. Shupee v. Railroad Commission of Texas, 123 Tex. 521, 73 S.W.2d 505 (Tex.Sup.Ct.1934).

In Lewis, Savings & Loan Commissioner et al. v. Southmore Savings Association, 480 S.W.2d 180, at page 184 (Tex.1972), the Court said:

"The rule was further clarified in Trapp v. Shell Oil Co., [145 Tex. 323, 198 S.W.2d 424] supra, to be that the Commission's order would be upheld if the prevailing party could produce substantial evidence in support of the order. The court determines from all of the evidence before it, the entire record, whether the Commissioner's action is or is not reasonably supported by substantial evidence. The court is not to substitute its discretion for that committed to the agency by the Legislature, but is to sustain the agency if it is reasonably supported by substantial evidence before the Court. Railroad Commission v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022 (1942); Hawkins v. Texas Co., 146 Tex. 511, 209 S.W.2d 338 (1948); Jones v. Marsh, 148 Tex. 362, 224 S.W.2d 198 (1949); Guinn, Administrative Law, 24 Southwestern Law Journal 216 (1970); Guinn, Judicial Review of Administrative Orders, 23 Baylor Law Rev. 34 (1971)."

■ Applying the appropriate rule set forth in the above authorities, we have carefully reviewed the record and find that the Appellant has not discharged his burden of establishing that the trial court erred. Appellant contends this is a case of first impression in Texas. Our conclusion that the special order did not violate Talent's constitutional rights is supported by the following out of State authorities:

Seattle Police Officers' Guild v. City of Seattle, 80 Wash.2d 307, 494 P.2d 485 (1972); Coursey v. Board of Fire and Police Commissioners, 90 Ill.App.2d 31, 234 N.E.2d 339 (1st Dist., 3rd Div. 1967); and Frazee v. Civil Service Board of City of Oakland, 170 Cal.App. 2d 333, 338 P.2d 943 (1959); Roux v. New Orleans Police Department, 223 So.2d 905 (La.Ct.App., 4th Cir., 1969, writ ref'd, 254 La. 815, 227 So.2d 148, cert. denied, 397 U.S. 1008, 90 S.Ct. 1236, 25 L.Ed.2d 421 (1970).

We have considered all of Appellant's points and find no merit in them. They are overruled.

The judgment is affirmed.

RALEIGH BROWN, J., not participating.

McCLOUD, Chief Justice (concurring).

Section 5 of Article 1269m, Vernon's Ann.Civ.Stats., authorizes the civil service commission of a city to enact rules and regulations providing for the dismissal of firemen or policemen who violate "special orders". The Civil Service Commission of the City of Abilene adopted such a rule. Section 23(13) Civil Service Rules and Regulations. Pursuant to such authority the fire chief issued a special order directing Talent to take a polygraph test. The special order was in writing, informed Talent that no criminal charges or prosecution would result from the examination, and set forth the questions which would be asked. All questions related directly to a stolen pickup which was found in Talent's possession.

Talent has raised serious and penetrating questions concerning the validity of the special order. He forcefully argues that the order was invalid because it was unrelated to his duties as a fireman.

In Jackson v. Firemen's & Policemen's Civil Service Commission of Galveston, 466 S.W.2d 412 (Tex.Civ.App.—Houston (1st Dist.) 1971, writ ref. n. r. e.) the fire chief issued a "special order" requiring a fireman to move his residence into the city limits of Galveston. While holding the order valid the Court said:

"In this case there is a suspension for disciplinary reasons, authorized by a rule adopted by the Civil Service Commission. Appellant refused to obey a special order. The order was given to require obedience to a policy promulgated by the chief executive officer of the city.

It must be presumed that the trial court found that the policy bears a reasonable relationship to maintenance of an efficient fire fighting force."

The Court further stated:

"It would be an unreasonable interpretation to hold that suspension is authorized for the violation of a special order if it is clearly unreasonable or unrelated to the duties of a fireman."

Talent relies upon the above quoted sentence to support his position that the order must be related to his duties as a fireman. The crucial question, as I view the matter, is not whether the order relates to Talent's functional duties, but the determinative factor is whether the order bears any reasonable relationship to his fitness or capacity to properly function as a fireman. As I read Jackson, *supra,* this is the test the Court applied. I think this test has been recognized and inferentially approved in prior Texas cases involving special orders. In Bryant v. City of San Antonio, 464 S. W.2d 888 (Tex.Civ.App.—San Antonio 1971, no writ) the Court upheld the suspension of an off-duty police officer who violated an order of his superior directing him to stay away from the Holiday Inn where the officer's ex-wife worked. The superior's action was prompted because the police officer had previously created a disturbance while arguing with his ex-wife. Also, in Lombardino v. Firemen's & Policemen's Civil Service Commission, 310 S. W.2d 651 (Tex.Civ.App.—San Antonio 1958, writ ref. n. r. e.) the Court upheld the suspension of a police officer for failing to obey an order to discontinue his ownership and operation of a creditor's association.

Talent was charged with receiving and concealing a stolen pickup. He was arrested and released on bond. There is evidence in the record that Talent told conflicting stories, concerning his involvement, to both the fire chief and an intelligence agent with the Department of Public Safety. The chief doubted that Talent was

telling the truth. The chief testified that in the past, five firemen had taken polygraph tests to "clear things up" and that some of these men were still working as firemen. He testified further that he had 128 men working for him and he had to maintain good discipline in order to function properly as a fire department. He stated that Talent's refusal to comply with the special order would hurt the discipline of the force. The chief believed that a polygraph examination was the only way he "had of finding the truth".

Statements obtained from Talent under threat of dismissal could not be used as evidence in a subsequent criminal prosecution, Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), nor would the results of a polygraph test be admissible in the trial of a criminal case. Lee v. State, 455 S.W.2d 316 (Tex.Cr.App. —1970). In Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968) the Supreme Court pointed out that public employees subject themselves to dismissal if they refuse to account for their performance of public trust, after proper proceedings, which do not involve an attempt to coerce them to relinquish their constitutional rights. Here, there was no demand or suggestion that immunity be waived as in Gardner v. Broderick, 392 U. S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968).

In Kammerer v. Board of Fire and Police Commissioners of the Village of Lombard, 44 Ill.2d 500, 256 N.E.2d 12 (1970). A police officer was charged, among other things, with violating a section of the Illinois Criminal Code, in that he kicked and damaged a squad car while he was off-duty. The officer was dismissed and he contended he was forced to testify against himself in violation of his constitutional rights under the Fifth and Fourteenth Amendments to the United States Constitution. While discussing Garrity and Gardner, the Court said:

"The net of these decisions, as we understand them is that if a public employee refuses to testify as to a matter concerning which his employer is entitled to inquire, he may be discharged for insubordination, but if he does testify his answers may not be used against him in a subsequent criminal prosecution. No case has been cited, and we have found none, which holds that a public employer, in the course of a disciplinary hearing into an employee's conduct, may not require the employee to disclose information reasonably related to his fitness for continued employment."

In Silverio v. Municipal Court of City of Boston, 355 Mass. 623, 247 N.E.2d 379 (1969), cert. denied 396 U.S. 878, 90 S.Ct. 151, 24 L.Ed.2d 135, an officer was discharged for refusing to answer questions concerning an auto theft ring. The Court said:

"Thus an employee knows that if he fails to divulge information pertinent to the issue of his use or abuse of his public trust he may lose his job. The fact of employment poses the continuing choice of whether to divulge such information. The Constitution of the United States, however, as we understand its construction, does not require that a public employer continue to employ in a position of public trust an employee who declines or renders himself unable to perform the duties of his position on the ground of the constitutional protection against self-incrimination. No threat or pressure of his superior coerces his choice. His choice is his own, even though it may be affected by his expectation that his superiors will perform their own public duties in the light of their appraisal of his conduct."

In Seattle Police Officers Guild v. City of Seattle, 80 Wash.2d 307, 494 P.2d 485 (1972) Chief Justice Hamilton fully discussed the cases dealing with the question of whether a police officer, involved in alleged police misconduct, can be validly dis-

missed for refusing to submit to a polygraph test. It appears that the courts of four states, California, Illinois, Louisiana and Washington have upheld dismissals, while the courts of Connecticut and Pennsylvania have reached contrary results. Frazee v. Civil Service Board, 170 Cal. App.2d 333, 338 P.2d 943 (1st Dist., Div. 2 —1959); Coursey v. Board of Fire & Police Commissioners, 90 Ill.App.2d 31, 234 N.E.2d 339 (1st Dist., 3rd Div.—1967); Roux v. New Orleans Police Dept., 223 So.2d 905 (La.App.) writ ref'd 227 So.2d 148 (1969), cert. denied 397 U.S. 1008, 90 S.Ct. 1236, 25 L.Ed.2d 421 (1970); Molino v. Board of Public Safety, 154 Conn. 368, 225 A.2d 805 (1966); Stape v. Civil Service Comm., 404 Pa. 354, 172 A.2d 161 (1961). As observed by Chief Justice Hamilton, neither *Molino* nor *Stape* completely closes the door upon the proposition that in appropriate circumstances a refusal to take a polygraph test could amount to grounds for dismissal. In *Molino* the Court stated:

> "It is important to note at the outset that none of the plaintiffs was, at any time, accused of any criminal activity. It is also noteworthy that they were not charged with insubordination or with any immoral or antisocial conduct."

The Court further noted there was no evidence that anyone claimed the officers had been untruthful. In *Stape* the court held that a refusal to submit to a polygraph test did not amount to "just cause" for dismissal under the existing civil service regulations. While holding that the refusal to take a polygraph test could amount to grounds for dismissal, the majority of the Court in Seattle Police Officers Guild v. City of Seattle, *supra,* stated:

> "In the instant case, serious and notorious charges of crime and corruption had, with appreciable cause, been leveled against members of the police department. By the very nature of the charges, serious public doubt was cast upon the integrity, the morality, and the fidelity of the department and its mem-

bership. An intensive internal administrative investigation was fully justified. Questioning in the course of the investigation was to be carried on within prescribed constitutional limits.

Under these circumstances, we conclude and hold that if, in the exercise of prudent judgment, the investigating authority determines it reasonably necessary to utilize the polygraph examination as an investigatory tool to test the dependability of prior answers of suspected officers to questions specifically, narrowly, and directly related to the performance of their official duties, then, such investigating authority may properly request such officers to submit to a polygraph test under pain of dismissal for refusal.

Bearing in mind that the reasonableness of an investigating authority's request, under varying circumstances, can be subjected to judicial scrutiny and abuses of discretion thereby curbed, coupled with the fact that, in any event, the results of a polygraph test and a subject's willingness or unwillingness to take the test cannot be admitted into evidence in subsequent criminal proceedings we see no constitutional or legal barrier to the conclusion we have reached."

Chief Justice Hamilton also pointed out that the test might be an instrument of exculpation and vindication.

In Frazee v. Civil Service Board of City of Oakland, 170 Cal.App.2d 333, 338 P.2d 943 (1st Dist., Div. 2—1959) a police officer was accused by a citizen of attempting to commit a felony. In connection with the investigation of the charge the police chief ordered the officer to submit to a polygraph test. The officer refused to comply with the order and was thereupon discharged from the police force. The order was upheld and the Court said:

> "Appellant's assertion that the results of polygraph tests are not admissible in evidence in the courts of this state is correct. 'Lie detector tests do not as yet

have enough reliability to justify the admission of expert testimony based on their results.' People v. Carter, 48 Cal. 2d 737, 752, 312 P.2d 665, 674. However, it does not follow that such tests are completely without value. It is well recognized that polygraph tests are commonly used by law enforcement agencies in the investigation and detection of crime, and that they have some value in such investigation. McCain v. Sheridan, 160 Cal.App.2d 174, 177, 324 P.2d 923. Such tests can serve 'to guide police investigators in their hypotheses.' 3 Wigmore on Evidence (3d ed.) § 999, p. 646."

The Court in Coursey v. Board of Fire and Police Commissioners, 90 Ill.App.2d 31, 234 N.E.2d 339 (1st Dist., 3rd Div.— 1967) held that the authority of a police chief under proper circumstances to issue an order requiring an officer to take a polygraph test, like any other sound and reasonable order for the good of the force, is inherent. In upholding the order the Court said:

"The chief of police was confronted with a situation where public confidence in his department might be undermined by the accusations made against one of its members. The chief would naturally want his subordinate exonerated and his department vindicated. A successful lie test by the truth-asserting officer would be a long step toward these ends—for in the public mind the result of such a test is often conclusive. In a situation like this, arranging for a polygraph examination and requesting the officer to take it was neither unreasonable nor useless. The chief would expect the officer to pass the test, and publication of the anticipated result would, from the public's view, clear the officer and restore confidence in the department.

The statutes prohibiting a court from requiring or suggesting that the defendant in a criminal trial or the plaintiff or defendant in a civil trial submit to a 'polygraphic detection deception test' apply neither in terms nor in principle to a proceeding before a Board of Fire and Police Commissioners. . . . The board's assessment of the officer's fitness for the responsibilities of police duty should be based upon all the information reasonably related to his fitness, and his willingness or unwillingness to submit to a polygraph test when accused or suspected of a crime, or of conduct detrimental to the police force is certainly a factor to be weighed.

Effective and efficient operation of a police department requires that allegations of police misconduct be thoroughly investigated. The polygraph machine can be a useful investigative tool when the test is skillfully prepared and is administered and interpreted by a qualified person; while it is not accurate to the degree that absolute judgments can be made as to the veracity of the person tested (People v. Triplett, 37 Ill.2d 234, 226 N.E.2d 30 (1967)) the results are often reliable within recognized limits. Thus, for example, the results of a polygraph examination may be of help in narrowing the field of persons suspected of an offense or may assist in a determination whether to commence disciplinary action when, as here, there is an accusation against a police officer which he insists is untrue. Be that as it may, the issue is not the accuracy of a polygraph examination, but Coursey's failure to take an examination.

The chief of police did not exceed his authority in ordering Coursey to take the examination and his authority was not arbitrarily exercised. As a private individual Coursey did not have to submit to the examination, but as a policeman he did not have the privilege of refusing; having refused, he forfeited any right he had to be retained on the police force because his refusal was in conflict with his obligation as a policeman to obey the order of his commanding officer. His refusal impeded the investigation of a serious charge affecting the whole police department as well as himself."

Firemen, like policemen, hold a special position of trust whereby they are entrusted with control of private property. To efficiently and effectively accomplish its mission, a fire department must have the respect and regard of the public. Here a fireman had been publicly charged with the criminal offense of receiving and concealing stolen property. Talent gave conflicting accounts regarding his involvement. These conflicting accounts raised in the mind of the fire chief serious questions concerning Talent's veracity and moral character. The chief testified that in the past, accusations had been made against five firemen and that all five had been 'cleared' by polygraph examinations. Without question a fire chief has the power and authority to issue proper orders necessary to maintain a well disciplined and efficient fire fighting force. I cannot say, from the facts in this case, the "special order" was unreasonable or unrelated to a determination of Talent's fitness and capacity to effectively serve in a special position of trust. I am of the opinion the judgment of the trial court should be affirmed.