O. J. KLEIN, Plaintiff-Appellant, *v.* THE BOARD OF FIRE AND POLICE COMMISSIONERS OF THE CITY OF PANA, Defendant-Appellee.

(No. 74-33;

Fifth District—October 8, 1974.

203

G. MORAN, P. J., dissenting.

J. Dale Berry, of Kleiman, Cornfield and Feldman, of Chicago, for appellant.

Joseph L. Fribley, of Fribley & Fribley, of Pana, for appellee.

Mr. JUSTICE CREBS delivered the opinion of the court:

This is an appeal from an order of the Circuit Court of Christian County affirming plaintiff's discharge from the police force of the City of Pana by that city's Board of Fire and Police Commissioners. Plaintiff contends that the evidence presented before the Board was insufficient to warrant his discharge; that the action taken against him was motivated solely by the fact that he had appealed a previous 5-day suspension; that two members of the Board were prejudiced and should have disqualified themselves; and that he was deprived of a fair hearing in that the Board refused to permit the hearing to be open to the public.

The complaint against plaintiff was filed by the chief of police on April 7, 1972, and consisted of 14 separate charges involving incidents occurring over a period of time from January 1969 to March 1972. Two of these charges, involving an alleged interference by plaintiff in a truancy hearing, and an unsolicited recommendation to a probation officer, were stricken for the reason that they formed the basis of the 5-day suspension which plaintiff had already appealed. Evidence was offered on only four of the remaining charges and the rest were dismissed. In its decision the Board found plaintiff guilty of (1) a battery committed upon Don Cohan on May 16, 1971, in violation of the rules and regulations of the Police Department and section 12—3 of the Criminal Code (Ill. Rev. Stat., ch. 38, par. 12—3), and (2) an assault on Thomas Reber on July 3, 1969, in violation of said rules and regulations and section 12—1 of the Code. Two other charges, involving the breaking of a door lock in the police station in March, 1971, and shooting a loaded gun into the air behind the police station in January, 1968, were held trivial in nature and meriting no decision.

The hearing was extensive and took a number of days to complete. On the Reber assault charge Thomas Reber testified that he ran a collec-

tion agency and that among his accounts were two bills against plaintiff, one for the Pana Community Hospital and one for a Ford Agency. After several unsuccessful efforts to effect collection by letter and telephone, plaintiff finally came to Reber's office. He was obviously angry, demanded Reber's identification, and then threatened him saying, "I'm going to bust your head wide open." Without giving Reber a chance to say anything he eventually left warning that, "As long as you are in this town you will walk a straight line." Reber stated that at no time did plaintiff touch him, but because of plaintiff's anger and size ( 6', 230-235 lbs) he was scared and did not report the incident to anyone. A telephone repairman, who happened to be in Reber's office at the time, corroborated Reber's testimony in every detail, adding that he had suggested that the matter be reported immediately but that Reber was too scared and did not want to provoke plaintiff in any way. Plaintiff testified that he did go to Reber's office, that he did demand his identification, and that he did tell him he was going to get his "block knocked off," but he only did so to stop him from making any more calls to his house, using profane and obscene language to his wife and daughter. In support of plaintiff's testimony his wife and daughter testified that a man they identified as Reber had called them on a number of occasions and had used profane and obscene language in an effort to collect said bills. In rebuttal, Reber denied ever using profanity over the telephone, saying that his agency members never so belittled themselves as professional collectors.

On the Cohan battery charge, Don Cohan testified that on May 16, 1971, at about 9:30 P.M., he and his brother, Jim, came to the police station to report an accident. When plaintiff saw him come in he grabbed him, pushed him up against the wall and demanded to know what stories he had been telling about him (apparently concerning an incident that had occurred between the two of them a week or two previously in the alley behind the station). Cohan said that plaintiff, while poking him in the chest with his knuckles, called him obscene names and finally picked him up and threw him against the wall. Cohan called to his brother, but plaintiff continued to abuse him, grabbed him by the throat, and eventually pushed and threw him down the stairs. When he landed at the bottom plaintiff followed him and kicked him and pushed him into a cell and locked it. Jim Cohan then called the mayor and about 20 minutes later the mayor, Jim and plaintiff came down to the cell block. Don said the plaintiff then asked him if he wanted to forget it and go home. He agreed, but when he got home his mother insisted that they both go back. She called the mayor again and they all met at the police station. This time plaintiff refused to tell Don's mother anything, saying

he did not have to, and instead told Don that he was under arrest for disorderly conduct. He then wrote out a ticket and refused to release him until the family paid $25 in bond money. The next day Don went to the State's Attorney's office to report the incident and sign a complaint. When he heard nothing further from this visit he went back again in the company of two city aldermen, but again there were no results. Jim Cohan testified that when he heard the commotion in the police station he demanded to know what was going on but plaintiff told him, "If you mouth off you are going to get some of the same." The mayor testified that when he arrived he did not hear Don call plaintiff any names, but that plaintiff, in telling him about the incident, said; "I kicked him in the ass going down." Mrs. Cohan wanted the mayor to fire plaintiff on the spot but he told her he had no such authority and advised her to go to the State's Attorney's office.

· Plaintiff testified that when the Cohans came into the station he approached Don and told him he had better leave those young girls alone over at the cab company or he would charge him with contributing to the delinquency of minors; that Don told him he would do as he pleased, and then called him some obscene names. Plaintiff stated that he then grabbed Don, informed him he was under arrest, and when he appeared to be trying to get away he hustled him down the stairs, towards the cell block. When he again tried to get away plaintiff said he tripped him with his foot and put him in a cell.

In his briefs on appeal plaintiff does not deny the occurrence of either of the above incidents. In the Reber confrontation he admits having strong words with Reber, but he argues his justification based on his and his family's testimony that he was provoked by Reber's alleged belligerent and profane telephone calls. In the Cohan incident he admits he engaged in a struggle with Cohan, but that he did so because Cohan became belligerent, used profanity, resisted his efforts to place him under arrest and tried to escape. In effect, he argues that he was in the right in each instance and that the Board and the circuit court should have accepted his version and should have found no just cause for his dismissal.

■■■ The principles governing a review of a police officer's dismissal have been well established in Illinois. Though cause has not been defined by statute it has been construed to mean some substantial shortcoming which renders an employee's continuance in office in some way detrimental to the discipline and efficiency of the service, and which law and sound public opinion recognizes as good cause for his no longer holding the position. (*Coursey v. Board of Fire & Police Commissioners*, 90 Ill. App.2d 31). It is the commission, and not the court on review, who has

the duty and the right to determine the credibility of the witnesses appearing before it (*Davenport v. Board of Fire & Police Commissioners*, 2 Ill.App.3d 864), and the court cannot substitute its judgment for that of the commission (*DeGrazio v. Civil Service Commission*, 31 Ill.2d 482), for the court's function is limited solely to ascertaining if the findings and decision of the administrative agency are against the manifest weight of the evidence. *Rizzo v. Board of Fire & Police Commissioners*, 131 Ill.App.2d 229.

■■■ Applying these rules to the facts before us we cannot fault the Board's findings or its order dismissing plaintiff. The testimony of Reber and the disinterested telephone repairman was straightforward and credible, and the acts of plaintiff constituted a blatant attempt to use the power of his office to further his own personal objectives, and could do nothing but bring discredit upon the police department as a whole. The testimony of Cohan, supported by his brother and the mayor, was likewise credible, whereas plaintiff's story that his actions were provoked by Cohan's resistance to arrest and attempt to escape would tax the credulity of the most naive. Rather, it appears that plaintiff's reactions were dictated by his uncontrollable anger to the obscenities allegedly voiced by Cohan. We can understand the provoking nature of obscene name-calling. However, we also believe that an experienced, competent police officer should have sufficient stature to control himself and resist the temptation to resort to physical violence, particularly with reference to a 19-year-old boy neither posing nor offering any physical threat. The many able, reputable and hard working men and women who wear the badge of a police officer should not have to be categorized and judged by the improper and ruthless acts of one so obsessed with the power and authority of his office. We find that the evidence amply supported the findings of the Board and that plaintiff's discharge was necessary to retain public confidence and trust in the police department so that it might continue to operate efficiently in the City of Pana.

■■ Plaintiff next contends that discharge proceedings were instigated against him solely because he exercised his right to appeal his 5-day suspension, and that the "official" charges were mere pretexts. From this contention he then argues that he cannot be discharged for exercising his legal right to appeal his suspension. We have difficulty following the logic of this argument. Clearly, his discharge was justified on the basis of the incidents above discussed. It may, or may not be, that plaintiff's attitude and actions following his suspension brought to a head the filing of formal charges against him, but, even if true, it does not follow that he was dismissed because of his appeal. The complaint listed a whole series of charges that occurred over a period of 2 or more years and

it would appear that he was fortunate that a complaint had not been filed sooner. Plaintiff's discharge was determined by the substantiation of the charges filed and not by the fact that he appealed a suspension imposed on other charges.

■■ Plaintiff next contends that two of the commissioners, Dr. F. W. Siegert and David L. Budds, were biased and prejudiced towards him and that by failing to disqualify themselves they denied plaintiff an impartial hearing. Plaintiff declined to make an offer of proof as to Dr. Siegert, but on appeal he argues that his prejudice was self-evident in his failure to disclose his interest in the Pana Community Hospital and his alleged irritation with plaintiff's counsel during the hearing. Dr. Siegert apparently was a life member of the hospital, being a resident doctor, and he had been a member of its board of directors. According to plaintiff those facts automatically show his bias and prejudice. Again we find his argument difficult to follow, for there is no evidence whatsoever that Dr. Siegert even knew of the hospital bill, nor is the bill itself the subject of the controversy. The issue involved is plaintiff's reaction to an attempt of an independent collection agency to collect an account. Dr. Siegert did on a couple of occasions urge counsel to get on with the hearing, but such remarks were directed solely to counsel and not to plaintiff. To construe them as showing prejudice towards plaintiff is unwarranted. The prejudice of Mr. Budds is alleged to have been shown by certain remarks he at one time made prior to this hearing and concerning another hearing involving plaintiff. Plaintiff had previously been charged with striking a fellow officer and Mr. Budds is alleged to have been heard to say that plaintiff should have been fired. However, Mr. Budds explained that his statement was taken out of context, that he had sat on the Board when plaintiff was acquitted of that charge and that he, Budds, had later said that if there had been more evidence probably both plaintiff and another officer should have been fired. The remark may have been ill-advised, subject as it is to a misconstruction, but in our opinion it demonstrates Mr. Budd's fairness in refusing to convict except on sufficient evidence. We find no showing of prejudice on the part of either commissioner.

■■ Finally, plaintiff contends that the Board's refusal to hold public hearings constituted a violation of his constitutional right of due process and was contrary to the requirements of the Illinois Open Meeting Act (Ill. Rev. Stat., ch. 102, par. 41). He cites *Morgan v. United States*, 304 U.S. 1, 82 L.Ed. 1129, to the effect that in administrative proceedings of a quasi-judicial character, the liberty and property of the citizens shall be protected by the rudimentary requirements of fair play and that these demand a fair and open hearing. In *Fitzgerald v. Hampton* (D.C. Cir.

1972), 467 F.2d .755, the same principle is quoted and the court stated further that where a governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the protection afforded by due process of law entitles the individual to a fair trial, and that inherent in a fair trial is the right to an open and public hearing. As to the affect of a commission regulation providing for a closed hearing where the issue involves a possible termination of employment, the court held that since said regulation was admittedly designed for the benefit and protection of the employee there was no reason why his offer to waive the regulation should not have been accepted.

We agree with these principles but we believe the facts of the case before us give rise to an exception. From a review of the record it appears that plaintiff's appeal of his 5-day suspension and the charges of misconduct were being considered together, but in sequence. On April 14, April 28, and May 12 evidence was heard on the question of plaintiff's suspension and these hearings were open to the public. Not until the hearing on May 25 did the Board announce that subsequent hearings would be closed. Two reasons were cited, (1) the belief of the Board that under the exception provided in the Open Meeting Act they were entitled to close the hearing when its purpose was to consider the employment or dismissal of an employee or to hear testimony on a complaint lodged against an employee, and (2) the fact that at the previous hearings approximately 100 people were present and the proceedings were interrupted with frequent laughter and remarks from the audience. At the May 25 hearing it appears that the brother and wife of plaintiff were permitted to attend. No mention is made of the press and it cannot be determined from the record whether or not the press was present. Later in this hearing there is evidence that the proceedings were interrupted by a number of plaintiff's supporters outside the window of the hearing room shouting, "O.J., O.J., he is our man." At the request of the chairman the plaintiff and his attorney went outside to try to control the individuals who were yelling, and the windows were closed to prevent a further disturbance. On June 10 plaintiff's father and mother were permitted to attend, and it would appear that the press was excluded though the record is not clear on this point. One woman protested vigorously about three or five people running "a whole complete town just because your name is Budds, Armstrong or Siegert [the commissioners] and a few other unmentionables." On June 19 the record fails to reveal who specifically was in attendance other than plaintiff's wife, but apparently the press did attend as this is indicated by Chairman Budds' question to plaintiff's counsel asking him if he "had any objection

to the press sitting up here." On June 26 when the members individually cast their votes in favor of plaintiff's discharge the meeting was open.

■■ As stated in 21 Am. Jur. 2d *Criminal Law* § 262 (1965), the right to a public trial even in a criminal case is not unlimited, but is subject to the inherent power of the court to preserve order and decorum in the courtroom, to protect the rights of the parties, and witnesses, and generally, to further the administration of justice. And thereafter in section 264 it is stated that notwithstanding the constitutional guaranty of a public trial the trial court has a broad discretion to regulate attendance in a court room and has inherent power to do so for the purpose of preserving order and decorum. We believe that the hearing officers in an administrative proceeding have a like power and this view is impliedly recognized in *Fitzgerald v. Hampton, supra,* wherein the court saw fit to point out specifically that there was no evidence in that record that the presence of the public and press would have in any way impeded the hearing, disrupted the otherwise calm atmosphere, or imposed additional burdens upon the commission which it could not handle.

■■ In the present record there is such evidence, not only while the public was present in the hearings before May 25, but even after their exclusion when their yelling partisanship from outside the hearing room caused the proceedings to be delayed and necessitated the intercession of plaintiff and his counsel with the disruptors. It might even be said that this partisanship was fostered by plaintiff as indicated by the fact that he, his family, and friends had circulated a petition among the town's residents seeking signatures approving and requesting plaintiff's retention on the police force. This petition was submitted to the Board with the request that it be admitted into evidence, but it was properly refused on the grounds that the Board's decision would rest solely on the basis of the evidence offered before it and that it would not be made, nor would the Board be influenced by a list of solicited votes as in a popularity contest. It is our conclusion on the basis of this record that the Board did not abuse its discretion in at times restricting attendance to plaintiff's immediate family for in doing so it was properly exercising its duty to preserve order and decorum and thereby assure to all parties a fair and impartial consideration of the case on its merits.

The judgment of the Circuit Court of Christian County affirming the decision of the Board of Fire and Police Commissioners of the City of Pana is affirmed.

Affirmed.

CARTER, J., concurs.

Mr. PRESIDING JUSTICE GEORGE J. MORAN dissenting:

Chief Sims, the sole instigator of the charges against Klein was appointed to his position on July 11, 1971, after having served as an alderman for 2 years. He suspended Klein for 5 days on March 18, 1972, and Klein appealed the suspension. Then on April 7, 1972, Sims filed 14 charges against Klein only because Klein had exercised his right to appeal his 5-day suspension. The record is replete with evidence to this effect. Sims testified:

> "If he can't accept the fact that he had someone over him then I would try to do everything I could to see, after he appealed the suspension, that I would go ahead and see what charges I could find to have him dismissed."

One charge the majority finds was sustained by the evidence concerned Klein's argument with a bill collector who had been harassing Klein and his family for a debt which Klein claimed he did not owe. This incident occurred on July 3, 1969, which was 2 years before Sims became chief of police and almost 3 years before the charges were placed against him. The incident with Cohan occurred months before Sims became chief and 1 year before the charges were filed. The mayor of Pana was called. He knew of the incident when it happened but he preferred no charges. The then chief of police of Pana also knew about the incident and he preferred no charges.

Prior to the incidents which brought about Klein's 5-day suspension, Sims and Klein had gotten along well and Klein had performed his job adequately. Sims testified:

> "I told O. J. Klein to his face more than once that I really appreciated the cooperation I was getting from him, how he had worked, if there was something not complete at the end of my shift I left it to him and I pointed out to him and he carried it out, he carried the orders out real good. He had made the statement to me, he said, 'you know since you have been on I have enjoyed working on the Police Department or working in the Police Department more than any time in my life.' He said, 'I really enjoy it.' He said 'this is something I never had before' and I said, 'this is the way it should be and I appreciate the fact that when I didn't have something completed that he went ahead and carried it out and took care of different things that were pending.' This is just the way it was. I figured things up to this time things were fine of this nature."

Apparently no public official of Pana, including the mayor, the former chief of police and Sims himself had, prior to Sims' five-day suspension,

felt there was any cause to discharge Klein. In other words, prior to that time there was no substantial shortcoming which rendered continuance in his employment detrimental to the discipline of the service. This detriment only came about after he had appealed his 5-day suspension.

Cause for discharge in the case of a policeman has been held to mean some substantial shortcoming which renders continuance in his employment detrimental to the discipline of the service and something which the law and a sound public opinion recognize as a good cause for his no longer occupying his position. (*Fantozzi v. Board of Fire & Police Commissioners*, 27 Ill.2d 357.) By Sims' own admission, Klein had served well for 3 years after the first incident and 1 year after the second. There was no indication his continued employment was detrimental to the discipline of the service because of either or both of these incidents.

Our supreme court stated in *Fantozzi* that the "* * * authority given the Fire and Police Commissioners to remove only for cause is not an arbitrary one, but is to be exercised on just and reasonable grounds." (27 Ill.2d at 360.) It is not just and reasonable to resurrect old incidents to discharge a policeman because he chose to exercise the right of appeal he is allowed by the statute.

I would reverse.